Lorenzo **CHAMBERS**, Plaintiff–Appellant,

v.

**TRM COPY CENTERS CORPORATION,** Defendant–Appellee.

**No. 313, Docket 94–7253.**

United States Court of Appeals, Second Circuit.

Argued Aug. 29, 1994.

Decided Dec. 19, 1994.

Michael H. Sussman, Goshen, NY (Scott Thornton, Stephen Bergstein, on the brief), for plaintiff-appellant.

Tarquin Jay Bromley, Liberty Corner, NJ (James L. Plosia, Jr., Apruzzese, McDermott, Mastro & Murphy, on the brief), for defendant-appellee.

Before: NEWMAN, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Lorenzo Chambers appeals from a final judgment of the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge,* dismissing his complaint against defendant TRM Copy Centers Corporation ("TRM"), for the termination of his employment on the basis of his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988) ("Title VII"). The district court granted summary judgment in favor of TRM on the ground that Chambers had failed to establish that his discharge occurred in circumstances giving rise to an inference of discrimination. On appeal, Chambers contends that the district court impermissibly credited an after-the-fact rationale proffered by TRM for his discharge and that there are genuine issues to be tried as to TRM's reason for discharging him. Though we disagree with Chambers's characterization of the district court's ruling, we agree that there are genuine issues of material fact to be tried, and we therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Certain of the facts are not in dispute. TRM is an Oregon-based company engaged in the business of operating self-service copy centers in retail establishments in the United States and elsewhere. In July 1989, TRM hired Chambers, "a black person of dark skin and Jamaican national origin" (Complaint ¶ 7), to work as a shop technician in its newly opened facility in Elmsford, New York. Unbeknownst to TRM, Chambers also continued to work an eight-hour "graveyard" shift at his prior job at the Bank of New York ("BNY").

At TRM, Chambers's duties included cleaning, fixing, and maintenance of used copy machines, and training at least one other person in the shop technician responsibilities. In February 1990, he received a pay increase. Prior to April 13, 1990, Chambers's personnel file apparently contained no document indicating any criticism of his performance.

Chambers's supervisor at TRM was branch service manager Daryl Perteet, an African–American. On April 13, 1990, Perteet sent Chambers a letter stating as follows:

> It has been necessary on several occasions to mention to you that your performance was not satisfactory. It has now become necessary for us to write this letter of reprimand. If there is no significant improvement immediately, we will take disciplinary action, including discharge.
>
> If you have any questions regarding the above matter, or if we can be of further assistance, please feel free to discuss it with me.

(TRM Letter dated April 13, 1990.) On April 20, 1990, TRM discharged Chambers. Perteet informed Chambers of the discharge.

In August 1990, Chambers filed a complaint of employment discrimination with local and federal administrative agencies. After receiving a right-to-sue letter, Chambers commenced the present action in 1992. Chambers alleged that he had performed all of his duties "adequately, properly and satisfactorily" (Complaint ¶ 16) and had done nothing to warrant any criticism. He alleged that, contrary to the TRM April 13 letter, neither Perteet nor any other TRM employee had informed Chambers of any unsatisfactory job performance. Despite Chambers's request, Perteet refused to provide an explanation for the termination.

The complaint alleged that after TRM discharged Chambers, it retained non-black employees who had been trained by Chambers and whose job performance was less satisfactory than that of Chambers. It alleged that in June 1990, TRM was expanding its operations and that it continued to hire shop and field technicians for at least another year. The complaint asserted that TRM had terminated Chambers's employment on the basis of his race and his national origin, in violation of Title VII. Chambers alleged that he had not been able "to find a comparable second job" (Complaint ¶ 26), and he sought damages, costs, and attorneys' fees.

### A. TRM's Motion for Summary Judgment

During the ensuing discovery period, TRM took Chambers's deposition, and from his testimony it learned for the first time that Chambers had continued to work at BNY while he was employed by TRM. TRM thereafter moved for summary judgment dismissing the present action on the grounds (1) that it had "discovered evidence during the pendency of this action which would have subjected plaintiff to immediate termination and precluded his employment with defendant in the first instance"; (2) that Chambers's "interim earnings [from his BNY job] completely offset his alleged damage claims against defendant"; and (3) that Chambers had failed to state a claim on which relief could be granted. (TRM Notice of Motion for Summary Judgment dated April 23, 1993.) In support of its motion, TRM submitted a statement pursuant to Local Rule 3(g) detailing the material facts as to which it contended that there existed no genuine issue to be tried and that entitled it to judgment as a matter of law. This statement, in addition to detailing salary and other employment terms, stated principally (a) that while working for TRM, Chambers had a full-time job with BNY; (b) that this "moonlighting" was contrary to TRM policy, would

have disqualified him from being hired, and would have sufficed, had TRM known of it, to warrant his being fired; and (c) that since TRM would not have permitted Chambers to work for it while holding another job, his earnings from BNY meant he had suffered no damages from the loss of employment with TRM. (TRM Rule 3(g) Statement dated April 23, 1993 ("First TRM Rule 3(g) Statement").) In addition to documents relating to Chambers's job application and earnings, TRM submitted affidavits from its vice president Matthew J. Shawcross, who had conducted the job interview with Chambers, and its director of human resources Kenneth Wolfe. Shawcross stated that Chambers had promised during his job interview to leave his job with BNY if TRM hired him. Wolfe stated that Chambers's "personnel file contain[ed] a document signed by Daryl Perteet, a black male and then-Branch Service Manager of the Elmsford Facility, indicating that Plaintiff's employment with TRM was terminated on April 20, 1990 based on his unsatisfactory 'job performance.'" (First Wolfe Affidavit, dated April 22, 1993 ¶ 17.)

Chambers admitted many of the assertions made in the First TRM Rule 3(g) Statement, including the allegations that TRM had a policy, as set forth in its employee handbook, against moonlighting, and that that policy had never permitted a full-time employee to have full-time outside employment. In his "Counter 3(g) Statement," however, supported by his affidavit dated May 7, 1993 ("First Chambers Aff."), Chambers disputed TRM's characterization of the policy as absolute and its assertions as to how it would have been applied to him. He stated, *inter alia,* that the handbook went no further than stating (a) that the company "prefer[red]" that full-time employees not engage in outside employment, and (b) that the only outside employment the handbook said "cannot be allowed" was employment "with a competitor." (First Chambers Aff. ¶ 3.) Chambers stated that although he had volunteered during his job interview that he would give BNY notice, he had never been told that leaving BNY was a condition of his employment with TRM. He stated, "[a]fter the interview and upon reflecting about the financial conse-

quences of so proceeding, I decided that I could not relinquish my other job." (First Chambers Aff. ¶ 2.)

TRM's first Rule 3(g) statement, filed with its April 23, 1993 motion for summary judgment, did not assert that there were any undisputed facts with regard to Chambers's job performance or as to the reasons for or circumstances of his discharge. In December 1993, TRM submitted an additional Rule 3(g) statement asserting, *inter alia,* that the decision to fire Chambers had been made by Perteet after warning him about poor job performance and after consulting with company officials in Oregon (TRM Supplemental Rule 3(g) Statement dated December 10, 1993 ("Second TRM Rule 3(g) Statement") ¶¶ 16, 22), and that Perteet "never made any statement, took any action, or gave any document to plaintiff which indicated any racial bias or bigotry. No TRM employee ever heard Daryl Perteet make any derogatory comment concerning an employee's race or country of origin" (*id.* ¶ 21). TRM stated that in April 1990, the month when Chambers was warned and discharged, the racial composition of TRM's 12–person workforce at Elmsford was "5 Caucasian, 4 African-American or dark-skinned West Indians (including the plaintiff and the Service Center Manager), 2 Asians, and 1 Hispanic." (*Id.* ¶ 23.) TRM stated that "[p]laintiff was not replaced by a Caucasian worker; in fact, his Shop Technician position was not filled at all by TRM." (*Id.* ¶ 24.)

According to the Second TRM Rule 3(g) Statement, which was accompanied by affidavits and deposition testimony from other TRM employees, Chambers's coworkers were critical of his alertness and his performance. Various employees said that Chambers frequently did not meet TRM standards with respect to the number of copier parts to be cleaned or refurbished, that he was ineffective in loading and unloading trucks for visits to customer sites, that he did not do proper installations of remote counting devices for TRM machines at customer sites, or that he was a very slow worker. Some stated that Chambers frequently appeared tired and lethargic at work, that he had fallen asleep while traveling to and from customer

sites, and that he had been "observed sleeping at his work bench, in the Company rest room, and in front of a customer during a visit to a job site." (Second TRM Rule 3(g) Statement ¶ 13.) TRM also submitted the deposition testimony of its operations supervisor Dan Raffetto, who had made several visits to the Elmsford facility totaling some 14 days during a four-month period while Chambers was employed there. Raffetto testified that he had "observed [Chambers] being slow" and was "concern[ed] over [Chambers's] sense of urgency." He admitted that he had observed no lack of accuracy in Chambers's work.

Several of the employees who submitted affidavits or testimony stated that Perteet had made statements that were critical of Chambers, for example, that Chambers was "lazy at a time when everyone had a lot to do," or was not "doing his fair share of the work," or that Perteet had caught Chambers "sleeping in the bathroom." TRM did not, however, submit any statement from Perteet himself. Perteet had left the company in June 1991, and TRM did not know his whereabouts.

In response to the Second TRM Rule 3(g) Statement, Chambers submitted a "Supplemental Counter 3(g) Statement," together with an affidavit dated January 14, 1994 ("Second Chambers Aff."), and a copy of his first affidavit, disputing the asserted criticisms of his alertness and job performance. He stated that though his title was shop technician, TRM was sufficiently satisfied with his performance to send him alone to make service calls at customer sites, a function normally performed by specially trained field technicians. He pointed out that he had received a pay increase in February 1990. Chambers stated that there was no job-related reason for his discharge; he stated that he had never been criticized prior to April 13, 1990, one week before he was fired:

4. No one from the company ever discussed with me any claim that I was sleeping on the job and I deny that this ever occurred. I was never given any indication that my superior believed I was too tired to appropriately discharge my duties.
. . . .

6. I was given one written warning by Daryl Perteet one week before my termination. After he showed me this April 13, 1990 warning, I indicated to him that I would not sign it because it was not right. He replied, "I will have to send it back to Oregon and have them re-phrase it so it can be presented to you again." I never again received any version of this letter. The note I was given was very vague. When I asked Perteet about it, he said, "It's not that you're not working, it's just that you're not going the extra mile". He did not define this with any greater precision.

7. Perteet never verbally reprimanded me or criticized my job performance. Oregon-based company officials visited our job location on at least two occasions during my employment. At no time did any of these managers make any comment to me about my job performance or ask me any questions concerning my job or my work environment. Nor, after their visits, did my job function change or was I given specific directions to alter the way I was performing my job.

8. When Mr. Perteet terminated me on April 20, 1990, he indicated to me that the decision was not his, but came from Oregon. He stated that the people in Oregon had made up their minds to get rid of me. He did not offer a specific reason for this action. Mr. Perteet did not state that he concurred with this decision, but indicated that he was simply providing me the message. I requested that Mr. Perteet provide me with a letter with the reason for my discharge. He called Oregon and then told me that I could not obtain such a letter.

(First Chambers Aff. ¶¶ 4, 6–8.) In his second affidavit, Chambers disputed in detail the recently proffered critical statements by TRM employees and stated that certain of these employees had never even worked with him. (Second Chambers Aff. ¶¶ 11–18.) Chambers stated that after he was fired he saw TRM advertisements in the local newspaper for the position of shop technician. (Supplemental Counter 3(g) Statement ¶ 24.)

Chambers also submitted copies of reports made by Raffetto with respect to his visits to the Elmsford facility while Chambers worked there, containing detailed comments on operations at that facility. Though these reports noted various criticisms with respect to the efficiency, personal appearance, or job performance of 10 of the other TRM technicians, identifying each by name, the reports did not mention Chambers.

TRM then submitted another affidavit from Wolfe (Reply Supplemental Affidavit of Wolfe, dated February 3, 1994), stating, *inter alia*, that Chambers's February 1990 pay raise had been an automatic salary adjustment in accordance with company policy and had nothing to do with his job performance, and that TRM's advertisements for a new shop technician were not for the purpose of replacing Chambers. Wolfe stated that Chambers had been one of three shop technicians; his discharge in April 1990 left TRM with two. In August 1990, one of the two remaining shop technicians was transferred, leaving Elmsford with only one, and Wolfe characterized the TRM advertisements as attempts to fill the newly vacant second-technician spot, not the third-technician position held by Chambers four months earlier. Wolfe stated that starting in August 1990, TRM hired, and lost, a series of persons for that second slot, and that TRM did not again have three shop technicians at Elmsford until March 1993, when it hired an African–American.

## B. *The District Court's Decision*

In a Memorandum Order dated February 24, 1994 ("Opinion"), the district court granted summary judgment dismissing Chambers's complaint, though not on the principal grounds on which TRM initially relied. 844 F.Supp. 183. The court found that TRM's explanations for the discharge could not be accepted as a basis for summary judgment, for they were disputed by Chambers and hence raised questions of fact that could not be resolved without a trial. *See* Opinion at 4 ("TRM's effort to provide specific nondiscriminatory grounds for dismissing Chambers would, standing alone, be subject to genuine.dispute and.cannot be accepted as a

basis for granting summary judgment.") The court concluded, however, that the questions raised by TRM's proffer were not "material," *id.*, because Chambers had failed to make out a prima facie case of discrimination.

The court noted that Chambers had presented evidence that he was a member of a protected class, "was at least initially deemed qualified for the work involved and was never told that he was fired for inadequacy," and was discharged. *Id.* at 3. However, the court found that Chambers had presented no evidence of circumstances that were sufficient to create an inference of unlawful discrimination:

No statistical evidence of discrimination by the employer (TRM) has been submitted. The workforce of TRM employees at the Elmsford Service Center where Chambers was employed consisted of 5 Caucasians, 4 African–American or dark-skinned West Indians, 2 Asians and 1 Hispanic.

There is no evidence of prejudiced comments, nor has any reason been proffered to suggest that Chambers' Black supervisor or others at TRM (which hired Chambers in the first instance) harbored any hostility based on his race or national origin. Chambers has presented no affirmative reasons to suspect discrimination, but attacks the credibility of TRM's asserted justifications for its action in dismissing him.

*Id.* at 3–4. The court found that TRM's asserted justifications, though plainly not sufficient in and of themselves to warrant judgment in TRM's favor as a matter of law, were not so improbable as themselves to imply a discriminatory animus:

While TRM's affirmative explanations present genuine issues of fact which cannot be resolved on summary judgment, they are not so outlandish as to support an adverse inference supporting Chambers' claim of discrimination.

*Id.* at 7.

The court also suggested that Chambers's moonlighting, even though not discovered by TRM until after it fired Chambers, might help to show that its termination of his em-

ployment was proper if it were undisputed that Chambers had performed his job poorly:

> Violation of an anti-moonlighting policy combined with, or threatening to lead to inattentiveness or sloppy work, especially in a sensitive position, may constitute[ ] a genuine work-related nondiscriminatory basis for adverse personnel action.
>
> If significantly harmful behavior has occurred or is threatened, the right of the employer to take appropriate action is important to the public as well as the employer. . . .
>
> If, thus, TRM's complaints about Chambers' conduct were undisputed or unaccompanied by weaknesses in TRM's own reaction to such complaints, Chambers' violation of TRM's anti-moonlighting rule would strengthen TRM's contention that the dismissal was proper regardless of whether the violation was discovered later or not.

*Id.* at 6–7. Notwithstanding the disputes between the parties as to the occurrence and merits of complaints about Chambers's work, the court concluded that "Chambers' discrimination claims must fall of their own weight," *id.* at 8, since

> [t]here are no statistical, anecdotal or other specific indicia of ethnic bias. Chambers' supervisor, also Black, showed no animus against Jamaicans. Nor is there any other evidence suggesting that anything more than an informal method of management at TRM was responsible for the debatable circumstances of Chambers' dismissal.

*Id.* at 7.

Judgment was entered dismissing the complaint. This appeal followed.

## II. DISCUSSION

On appeal, Chambers contends that summary judgment was inappropriate because a genuine issue of material fact exists as to TRM's motive for its discharge of Chambers. He argues that in granting summary judgment, the court improperly resolved disputed questions of fact and credited TRM's after-acquired evidence of moonlighting as a basis for Chambers's discharge. Though we do not view the district court as having relied on TRM's after-the-fact rationale, and we do not believe the court resolved most of the factual disputes, we conclude that the court, in ruling that Chambers had not established his prima facie case, inappropriately drew some fact inferences in favor of TRM and did not credit all of the inferences that could be drawn in favor of Chambers.

### A. Summary Judgment and Employment Discrimination

■ A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See, e.g.,* Fed.R.Civ.P. 56(c); *see generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, *see, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Balderman v. United States Veterans Administration,* 870 F.2d 57, 60 (2d Cir.1989); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987). The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion. *See, e.g., United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Ramseur v. Chase Manhattan Bank,* 865 F.2d at 465.

■ On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue. v. Windsor Locks*

*Board of Fire Commissioners*, 834 F.2d at 58 (internal quotes omitted); *see also Gallo v. Prudential Residential Services Limited Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See, e.g., Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988).

■■■ In an employment discrimination case, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (*"Burdine"*); *see also St. Mary's Honor Center v. Hicks*, — U.S. —, — – —, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of discriminatory discharge, the plaintiff must show (1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *See, e.g., Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991) (religious discrimination in violation of Title VII); *Ramseur v. Chase Manhattan Bank*, 865 F.2d at 464 (racial discrimination in violation of Title VII and 42 U.S.C. § 1981); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (national origin discrimination in violation of § 1981); *cf. Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114–15 (2d Cir. 1988) (discrimination in violation of ERISA § 510, 29 U.S.C. § 1140); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir.1983) (age discrimination in violation of 29 U.S.C. §§ 621–634).

■■■ In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that " '[e]mployers are rarely so cooperative as to include a notation in the personnel file' " that

their actions are motivated by factors expressly forbidden by law. *Ramseur v. Chase Manhattan Bank*, 865 F.2d at 464 (quoting *Thornbrough v. Columbus & Greenville Railroad Co.*, 760 F.2d 633, 638 (5th Cir. 1985)); *see also Dister v. Continental Group, Inc.*, 859 F.2d at 1112 ("In "reality ... direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier.") Because an employer who discriminates is unlikely to leave a "smoking gun" attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence. *See, e.g., Rosen v. Thornburgh*, 928 F.2d at 533.

■■■ Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position, *see, e.g., Meiri v. Dacon*, 759 F.2d 989, 995–96 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); or the employer's criticism of the plaintiff's performance in ethnically degrading terms, *see, e.g., Lopez v. S.B. Thomas*, 831 F.2d at 1189; or its invidious comments about others in the employee's protected group, *see, e.g., Ostrowski v. Atlantic Mutual Insurance Companies*, 968 F.2d 171, 182 (2d Cir.1992); or the more favorable treatment of employees not in the protected group, *see, e.g., Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir.1993) (in a supposed "reduction in force," the plaintiff, a black, was the only person to lose her job); or the sequence of events leading to the plaintiff's discharge, *see, e.g., Ostrowski v. Atlantic Mutual Insurance Companies*, 968 F.2d at 183; or the timing of the discharge, *see, e.g., Dister v. Continental Group, Inc.*, 859 F.2d at 1115. The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion "at the prima facie stage is *de minim[i]s.*" *Id.* at 1114 (affirming summary judgment, but rejecting district court's rationale that prima facie case had not been established).

Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances "giv[e] rise to an inference" of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.

■■■■ Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, " 'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–55 and n. 8, 101 S.Ct. at 1094 and n. 8) (emphasis in *Hicks* ). After the defendant has articulated such nondiscriminatory reasons, the plaintiff has an opportunity to show that the reason was merely a pretext for discrimination. Pretext may be demonstrated either by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, or by reliance on the evidence comprising the prima facie case, without more, *see St. Mary's Honor Center v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2749.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, [n]o additional proof of discrimination is *required.*

*Id.* (emphasis and brackets in original, internal quotes and footnote omitted).

**B.** *The Record in the Present Case*

■■■■ There is no dispute that Chambers met his burden of establishing the first three elements of his prima facie case. He is concededly a member of a protected class; he presented evidence that he had performed his duties satisfactorily; and there is no question that he was discharged. The question is whether he met his *de minimis* burden of showing circumstances that would permit a rational finder of fact to infer invidious discrimination. We conclude that he did.

To begin with, Chambers presented evidence of a common circumstance contributing to an inference of discrimination, *i.e.,* that after firing him from his position as shop technician, TRM advertised for applicants for the job of shop technician, apparently seeking applicants having qualifications similar to those of Chambers. Though the Wolfe affidavit proffered an explanation that those advertisements were not an effort to fill the shop technician slot vacated by Chambers but only to fill a different shop technician slot, that explanation, even if it were not inconsistent with some of the other evidence proffered by TRM, need not be accepted by a factfinder. The court was not free to accept the Wolfe affidavit as true as a matter of law.

Further, there are other circumstances that would help to support an inference of discrimination. On the surface, of course, there are circumstances that would justify instead an inference that TRM had no discriminatory animus. The ethnic makeup of its 12–person workforce at Elmsford was particularly varied, with more minority workers than Caucasians. Further, there is no direct proof of a discriminatory animus, as Chambers proffered no evidence of any invidious remarks by Perteet, by other TRM officials, or by any of his coworkers. Yet the facts that there were no such remarks and that the ethnic composition of the staff was balanced would not be dispositive if, for example, the company had sought to downsize its operation and chose to do so by firing only one or more of its minority employees. And looking at the statements, actions, and inactions of TRM and its employees, questions and inconsistencies abound as to the reason for Chambers's discharge.

For example, although TRM in its supplemental submissions in support of summary judgment took the position that Chambers's performance was so poor that he repeatedly had to be admonished (*e.g.*, TRM Memorandum of Law in Support of Defendant's Supplemental Motion for Summary Judgment at 5 ("[i]t quickly became evident ... that [Chambers] was in fact not capable of performing the duties of a Shop Technician")), in fact TRM did not discharge him until he had been on the job for nearly nine months, and he was given a three percent raise after six months. Moreover, Elmsford had approximately 12 employees, including Chambers and Perteet. In detailed Elmsford evaluations, which began some five months into Chambers's tenure and ended a month before he was fired, Raffetto's reports expressed criticisms of Perteet and the 10 other employees, all identified by name; but Chambers's name nowhere appears in these reports. The factfinder could well infer that since Chambers was the only employee at the facility—or one of very few—that Raffetto did not mention in a critical way, Chambers's performance was likely completely satisfactory. Moreover, even Raffetto, who claimed in his deposition to have been concerned about Chambers's lack of a "sense of urgency," testified that he had seen in Chambers's performance no lack of accuracy.

Further, if the factfinder accepted so much of Raffetto's testimony as indicated that TRM had a "sense of urgency" with respect to its relatively new Elmsford facility, the factfinder could well question the credibility of Wolfe's assertion that the company made no attempt to fill Chambers's position for nearly three years.

In addition, if, as TRM contends, Perteet and many other TRM employees viewed Chambers as a slow, lazy, and lethargic worker who slept on the job, and if, as some of these other employees stated, they had complained about Chambers in this regard, the finder of fact would undoubtedly question why there was not a single mention of such a problem in Chambers's personnel file. If this problem was the reason for the April 13 letter, why was it not specified? If this was the reason for the discharge, why was he not so informed? In point of fact, so far as the record before this Court shows, all of the suggestions that Chambers had been lethargic, slow, sleepy, or lacking in "urgency" were first aired only after TRM learned, during the course of this lawsuit, that Chambers had been working full time at two jobs.

The district court inferred that the absence in Chambers's personnel file of any early or specific criticisms of his job performance, and the absence of any explanation as to the alleged defects in his performance, were the result of an informal management style. That inference is permissible, but it plainly is not required as a matter of law; and it was not the court's function on a summary judgment motion to draw it as a matter of fact.

Crediting Chambers's sworn statements and drawing all permissible inferences in his favor, the trier of fact could find that Chambers's performance was satisfactory, that he never slept on the job, and that TRM in fact had thought sufficiently highly of his performance to have him train other shop technicians and to give him assignments exceeding his job description. The factfinder could infer that TRM decided in April 1990 to fire Chambers but refused to give him any concrete reason; that it sought to fabricate a favorable record by giving him the April 13 letter saying falsely that he had received job-performance warnings previously; that the letter's conclusory statement that his job performance was poor was also false; that although the letter held out the promise that Chambers would not be further reprimanded or disciplined if his performance improved, that promise was false because TRM (a) refused to tell him in what respect he supposedly needed to improve, and (b) proceeded to fire him before he would have been able to demonstrate improvement.

The factfinder could also conclude that TRM's placement of the entire onus for Chambers's discharge on Perteet, an African-American (a) who could not be found to testify, and (b) from whom TRM apparently had not obtained a supporting statement even while he was employed by TRM in the 10 months after Chambers's filing of his employment-discrimination complaint against TRM with state and federal administrative agencies, should be discredited. It could find that Perteet told Chambers that Perteet did not know why the company wished to fire

Chambers; and it could find that the reason that TRM (a) falsely claimed to have reprimanded Chambers prior to April 13 and (b) refused to give him any explanation of its claim of poor "job performance" was that TRM wished to conceal the real reason for its decision to terminate his employment. The factfinder could infer that TRM's real reason was an unlawfully discriminatory one.

In sum, as the district court noted, "Chambers' dismissal" occurred in "debatable circumstances." Opinion at 7. The conduct and resolution of that debate are properly left to the trier of fact. We conclude that the evidence as to the circumstances of Chambers's discharge sufficed to meet Chambers's *de minimis* burden of establishing a prima facie case. Since, as the district court found, TRM's proffer of nondiscriminatory reasons raised questions of fact, Chambers's evidence sufficed to withstand TRM's motion for summary judgment.

In rejecting summary judgment in this case, we should not be misunderstood as suggesting that summary judgment is never appropriate in discrimination cases. Though caution must be exercised in granting summary judgment where intent is genuinely in issue, *see Gallo v. Prudential Residential Services Limited Partnership*, 22 F.3d at 1224, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact. *See, e.g., Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994); *Dister v. Continental Group, Inc.*, 859 F.2d at 1118; *Meiri v. Dacon*, 759 F.2d at 998.

### C. *The Role of After-Acquired Rationales*

Chambers also contends that the district court adopted the view that after-acquired evidence may constitute a genuine work-related nondiscriminatory basis for an adverse personnel decision. He states that the court accepted TRM's proffered reasons for the discharge in part because TRM found after-acquired evidence that it claimed justified the dismissal.

As we read the district court's opinion, the court did not rely on TRM's after-acquired rationale, finding that the evidence was not "undisputed." Opinion at 7. The court did, however, suggest that reliance on such an after-acquired rationale could help to defeat Chambers's claim if TRM's evidence of that rationale were accepted. Although some of our sister Circuits have endorsed the view that after-acquired evidence may be used by an employer to defeat a claim of employment discrimination, *see, e.g., Summers v. State Farm Mutual Automobile Insurance Co.*, 864 F.2d 700, 708 (10th Cir.1988) (after-acquired evidence of employee wrongdoing can bar all remedies); *Washington v. Lake County*, 969 F.2d 250, 256 (7th Cir.1992); *McKennon v. Nashville Banner Publishing Co.*, 9 F.3d 539, 542 (6th Cir.1993), *cert. granted*, — U.S. ——, 114 S.Ct. 2099, 128 L.Ed.2d 661 (1994); *Welch v. Liberty Machine Works, Inc.*, 23 F.3d 1403, 1405 (8th Cir.1994), others have rejected that view, *see, e.g., Mardell v. Harleysville Life Insurance Co.*, 31 F.3d 1221, 1238 (3d Cir.1994) (after-acquired evidence irrelevant at liability stage, though it may be relevant to some issues concerning remedies), *petition for cert. filed* (U.S. Oct. 24, 1994) (No. 94–742); *see also Wallace v. Dunn Construction Co.*, 968 F.2d 1174, 1181 (11th Cir.1992), *opinion vacated pending rehearing en banc*, 32 F.3d 1489 (1994).

This Court has not addressed the question, and we need not do so here since it is hardly clear that TRM will be able to establish that its policy against moonlighting was as strict as TRM has sought to characterize it. The employee handbook on which TRM relied actually stated that the company "prefer[red]" that full-time employees not engage in outside employment, and that an employee should obtain permission from his supervisor before accepting such employment. The only outside employment that the handbook stated "cannot be allowed" was employment "with a competitor." Notwithstanding TRM's characterizations of the handbook, therefore, and its position that it either would not have hired or would have fired Chambers for moonlighting, the provisions themselves leave open the possibility that an employee could be granted permission to retain outside employment with a noncompetitor of TRM. The testimony of TRM vice president Shawcross supports this possibility. He testified that TRM's policy

required that if an employee wanted to have a second job in addition to the job

with TRM, that they would be required to notify *and make arrangements with management.* Primary purpose of this is so we can determine, if the company were to allow it, that there would be no conflicts. (Shawcross Deposition at 45 (emphasis added).)

Even if a strict policy against moonlighting could be established, however, we note our doubt as to the validity of an after-acquired rationale as a defense to a claim of prohibited discrimination. The recognition of such a defense would not be consistent with the goals of Title VII. · It may well be that by the time the present case is tried, the Supreme Court will have resolved the conflict among the circuits on this issue, *see McKennon v. Nashville Banner Publishing Co.,* — U.S. ——, 114 S.Ct. 2099, 128 L.Ed.2d 661 (1994).

## CONCLUSION

We have considered all of TRM's arguments on this appeal and have found them to be without merit. The judgment of the district court granting summary judgment is vacated, and the matter is remanded for trial.