Carmella GOOD, Administratrix of the Estate of John Anthony Good, Jr., deceased, and Carmella Good, individually, Plaintiffs,

v.

The PRESBYTERIAN HOSPITAL IN the CITY OF NEW YORK, Columbia–Presbyterian Medical Center, Babies Hospital, Robyn J. Barst, M.D., Craig Smith, M.D., Lynne Quittell, M.D., and John Doe I through John Doe XXX, Defendants.

No. 93 Civ. 3794 (JGK).

United States District Court, S.D. New York.

Aug. 2, 1996.

Richard F. Stevens, Stevens & Johnson, Allentown, PA, for Plaintiff.

Barbara A. Dalton, McAloon & Friedman, P.C., New York City, for Defendant Craig Smith, M.D.

Peter L. Korn, Dona Feeney, McDonough, Korn, & Eichhorn, Park Place Legal Center, Springfield, NJ, for Defendant Presbyterian Hospital.

### OPINION AND ORDER

KOELTL, District Judge:

This is a medical malpractice action arising out of a heart and lung transplant performed by Dr. Craig Smith, a transplant surgeon at Presbyterian Hospital, on John Anthony Good, Jr. ("John Jr.") on August 12, 1990. The plaintiff, Carmella Good, individually and as Administratrix of the Estate of John Jr., alleges a lack of informed consent. The plaintiff maintains that Dr. Smith failed to advise her that the organs to be transplanted had tested positive for the presence of cytomegalovirus ("CMV"). The plaintiff contends that the virus caused John Jr.'s death.

This action was originally commenced against various defendants including Dr. Smith, the pediatric cardiologist; Dr. Robyn Barst, the pediatric pulmonologist; Dr. Lynne Quittell; John Doe I through John Doe XXX; and the Presbyterian Hospital. Only Dr. Smith and the Presbyterian Hospital remain as defendants in this action. Dr. Smith and the Presbyterian Hospital now move for summary judgment pursuant to Fed.R.Civ.P. 56.

The plaintiff's first claim is that Dr. Smith failed to follow the informed consent procedure of New York Public Health Law § 2805–d(1) which requires that a person providing professional treatment or diagnosis disclose to the patient the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation. The defendants argue that it was not, and is not the standard practice for transplant physicians in the United States to discuss the CMV status of proposed donor organs with patients or their representatives. Therefore, the defendants argue that the plaintiff has not and could not establish a failure to comply with the informed consent procedure under New York law.[1]

Plaintiffs' second claim is that the defendant, Presbyterian Hospital, is vicariously liable for Dr. Smith's alleged failure to provide informed consent to the plaintiff. Presbyterian Hospital argues that the duty of informed consent belongs to the doctor and that it is not vicariously liable for Dr. Smith's actions since he was not a hospital employee.

### I.

There is no dispute with respect to the following material facts. John Jr., a five

---

1. All parties agree that New York law governs this action in which jurisdiction is based on diversity of citizenship.

year old boy, was diagnosed in 1990 with primary pulmonary hypertension and his life expectancy was between twelve and eighteen months. (Smith Aff. at ¶ 5.) John Jr.'s condition was initially treated at a hospital in Philadelphia before he was referred to Dr. Barst at Presbyterian Hospital. Dr. Barst recommended that defendant, Dr. Smith, who is not an employee of Presbyterian Hospital, perform a heart/lung transplant.

In March 1990, John Jr. underwent evaluation and treatment at Presbyterian Hospital. On May 29, 1990, a potential donor became available to the Presbyterian's Hospital's transplant team, but the transplant did not proceed because the donor organs were not acceptable for transplant. (Smith Aff. at ¶ 8.) At that time, Dr. Smith discussed the potential benefits and risks of the operation, and the plaintiff signed a consent form. (Smith Aff. at ¶ 7.) The plaintiff, Carmella Good, alleges that the transplant did not proceed because Dr. Smith told her, "they (the lungs) have to be clean, perfect, nothing, no spots, no diseases, no viruses." (Carmella Good Dep. at 286.)

In August 1990, another donor became available. Prior to death, the child donor had received blood transfusions and was subsequently determined to be positive for CMV. The plaintiff maintains that the donor's CMV status was known to Dr. Smith and the other members of the transplant team prior to accepting the organs on behalf of John Jr., who was CMV negative. The doctors had previously provided the plaintiff with a booklet detailing the many risks of a cardiopulmonary transplant, but there is no contention that Dr. Smith advised the plaintiff that the donor for the specific transplant was CMV positive. The plaintiff again signed an informed consent form. (Smith Aff. at ¶ 9.)

It is not disputed that the transplant was successful. It is also undisputed that after the initial period, John Jr.'s condition started to deteriorate. Dr. Smith admits that John Jr. showed signs of allograft rejection, CMV infection, and suffered from barotrauma and lung disease. (Smith Aff. at ¶ 15.) John Jr. eventually died on October 5, 1990. The parties dispute whether CMV played a substantial role in causing John Jr.'s death. It is not disputed that the autopsy findings are consistent with both rejection and infection.

## II.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *Gallo*, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether summary judgment is appropriate, a court must resolve all ambiguities against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo*, 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing

that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

■ If the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.,* 475 U.S. at 586, 106 S.Ct. at 1356. The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. The nonmoving party may not rest upon mere allegations or denials of the moving party's pleadings. *Anderson,* 477 U.S. at 248–249, 106 S.Ct. at 2510–2511. Speculative and conclusory allegations are insufficient to meet this burden. *Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

### III.

■ The plaintiff alleges that Dr. Smith is liable for medical malpractice because he failed to comply with the informed consent procedure of New York Public Health Law § 2805–d(1).[2] The plaintiff contends that she was not properly informed about the risks of CMV infection and the effects that CMV positive organs can have in the body of a patient who is CMV negative.

The plaintiff alleges that:

Despite having told Mrs. Good in May that the organs needed to be perfect, Dr. Smith made the decision *himself* to accept the mismatched organs. Although Dr. Smith told other members of the transplant team about the mismatch prior to surgery, no one ever conveyed that information to Mrs. Good or Mrs. Tucker [a close friend of Mrs. Good]. They arrived, and were given a consent form and told to sign it. The

form says nothing about the now known CMV mismatch.

(Pl.'s Mem.Opp'n Mot.Summ.J. at 9.)

The plaintiff did receive an informational booklet prior to the May 1990, aborted transplant detailing the many risks involved with organ transplants, including the possibility of CMV infection. But, the plaintiff contends that Dr. Smith said that the organs needed to be perfect and in view of that statement, she would not have consented to an operation in which the organs to be transplanted were CMV positive. As a result, she argues that Dr. Smith denied her the information that would have allowed her to make an informed choice. The plaintiff's proposed expert, Dr. John Shane, a pathologist, testified that:

[S]he (Mrs. Good) should have been informed that the organs are CMV positive and that in this case John, the recipient, was CMV negative. She should have been informed that there is a very definite risk of him contracting CMV as a result of the positive organs; and that that probability was very significant; and that CMV is number one, an infection, which in and of itself can cause death and is hazardous particularly in the case of immunosuppressed patient. . . .

(Shane Dep. at 71.)

Dr. Shane further testified that "it was Dr. Smith's responsibility to make sure that (advising Mrs. Good that the child was going to be receiving CMV positive organs) was done." (Shane Dep. at 104.)

The defendants are entitled to summary judgment because there is no evidence that Dr. Smith violated the standard for informed consent that has been adopted by the New York State Legislature. Under § 2805–d, a medical practitioner need only advise of those reasonably foreseeable risks and benefits as a "reasonable medical practitioner under similar circumstances would have disclosed." *See Troy v. Jewish Hillside Medical Center,* 86 A.D.2d 631, 632, 446 N.Y.S.2d 347, 349 (2d Dep't 1982).

---

2. Section 2805–d(1) states:

Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably

foreseeable risks and benefits involved as a reasonable medical, dental, or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.

The undisputed universal practice of reasonable medical practitioners under similar circumstances is not to discuss specifically the CMV status of the organs with the patient or the patient's representative. It is undisputed that Dr. Smith followed the practice employed by the nationwide transplant community in not communicating the donor's CMV status with Mrs. Good. Affidavits by members of the national transplant community submitted in support of Dr. Smith's motion establish that no transplant center in the United States discusses the issue of donor CMV status and "mismatch."

Dr. Steven Lansman, Director of the Mount Sinai Medical Center Heart/Lung Transplant Program, states:

> [I]n August, 1990, it was and remains to this date, our policy to perform transplants, despite the CMV status of the donor organs and recipients at the time of transplant. Our policy is based on the fact that a majority of the population is CMV positive, along with the reality that acceptable heart/lung donor organs are rare overall, especially true for a young child, where size discrepancies between the donor and the recipient may be even more difficult to reconcile.

(Lansman, Aff. at ¶ 3.)

Dr. F. Jay Fricker, Director of the Heart/Lung Transplant Team at Children's Hospital of Pittsburgh, concurs with Dr. Lansman:

> At Children's Hospital of Pittsburgh, the transplant team's policy is to have discussions with the patient's family concerning the general risks of transplant including infection, rejection, complications of immune repression regimens and projected length of survival after transplant. These discussions take place at initial evaluation and during the pre- and post-transplant follow-up. In regard to CMV status of donor organs, we did not at the time of this patient's evaluation discuss the possible use of CMV mismatched organs.
>
> Neither is it our practice to discuss with the family immediately pre-operatively the CMV status of the donor organs that have become available. The decision to proceed with specific donor organs is a clinical judgment made by the transplant team at the time the organs become available. The organs *are not* rejected on the basis of their CMV "mismatch" status in 1995, nor was that our practice in August of 1990. There are multiple parameters upon which the transplant team either accepts or rejects organs for transplant including organ donor-recipient size, donor organs function, donor-recipient blood type, and current clinical status of recipient.
>
> It is my understanding that the plaintiffs in this case were advised of the risks of death, rejection and infection associated with the proposed operation. In my view, such discussions were proper and in conformity with the practices followed by most, if not all, transplant centers in the United States.

(Fricker Aff. at ¶¶ 6, 7, 8.)

Dr. Joel D. Cooper, the Head of the Section of General Thoracic Surgery, at the Washington University Medical Center, testified:

> In 1990, it was not the accepted practice within the transplant community to reject heart or lung donor organs because of CMV 'mismatch' with the recipient....
>
> Regarding discussion with the family concerning informed consent for the transplant, it is not my practice nor the practice of this institution, nor of any transplant institution, that I am aware of, to discuss the CMV status of the organs to be transplanted. A possible CMV mismatch is one of the clinical aspects to be considered by the surgeon at the time of deciding to accept or reject organs as appropriate for transplant.

(Cooper Aff. at ¶¶ 3, 6.)

The plaintiff does not dispute that this is the practice of the national transplant community, and indeed has proffered no testimony by any person that this was not the universal practice. The plaintiff has proffered no evidence to show that any reasonable transplant surgeon in the United States would have advised about the CMV status of donor organs in 1990. The plaintiff therefore cannot as a matter of law establish any violation of the informed consent standards by Dr. Smith.

■ The plaintiff essentially asks this Court to modify the standard of informed consent adopted by the New York State Legislature. Relying on the testimony of her expert, Dr. Shane, a pathologist, the plaintiff argues that even though no transplant surgeon *would* have advised of the risks of CMV donor mismatch in 1990, reasonable transplant surgeons *should* have advised of the risk. But, that is not the standard adopted by the New York State Legislature and it is uncontested that the statute governs this case.

New York has adopted a standard of care for informed consent that relies on what reasonable medical practitioners would have done. In some cases, there may be close questions under this standard, and reasonable medical practitioners may differ. But in this case, the undisputed evidence is that the universal practice was not to advise of the risks about which the plaintiff claims it was malpractice not to advise her. In the face of this evidence, the plaintiff has raised no issue of fact that warrants a trial.

Moreover, the plaintiff has not even proffered any competent evidence that transplant surgeons in the United States were acting unreasonably in 1990 by not following the undisputed standard practice of not advising of the risks of CMV donor mismatch. The expert affidavits explain the reasons why transplant surgeons universally did not advise of the risks of transplant organs with a CMV mismatch. The only evidence the plaintiff proffers of what transplant surgeons should have advised about is the testimony of Dr. Shane, a pathologist, who is not a surgeon, much less a transplant surgeon. The failure to proffer the testimony of an expert in the field of transplant surgery underscores the failure of the plaintiff to satisfy the standard required to show an absence of informed consent under New York state law.

■ An expert must possess the requisite skill, training, knowledge, or experience to ensure that an opinion rendered is reliable. *See LaMarque v. North Shore Univ. Hosp.,* —— A.D.2d ——, 643 N.Y.S.2d 221 (2d Dep't 1996). The failure to offer competent medical expert testimony is fatal to a claim of medical malpractice. *See id.;* N.Y.Civ.Prac.L. & R. § 4401–a. While experts in specialties closely related to the field of expertise of the defendant may testify, there is no evidence that Dr. Shane has the expertise to testify about the standards that should have been followed by transplant surgeons in advising about the risks of transplants.

The defendants' motion for summary judgment must be granted because, in response to the defendants' proffered evidence, the plaintiff cannot establish any violation of the informed consent standard applicable in New York.

## IV.

Plaintiff's second claim is that Presbyterian Hospital is vicariously liable for Dr. Smith's alleged failure to provide the necessary information for Mrs. Good to give an informed consent to the transplant operation. Because the plaintiff cannot prevail on her claim of medical malpractice against Dr. Smith, her claim against Presbyterian Hospital for vicarious liability must also be dismissed.[3]

## CONCLUSION

For all of the reasons stated above, the defendants' motions for summary judgment are **granted**. The Clerk is directed to enter judgment dismissing this case.

**SO ORDERED.**

---

3. The final issue raised in the pending matter is whether the defendants are entitled to a protective order precluding the plaintiff from using the contents of the Grand Rounds Report, a record from Presbyterian Hospital. The motion for a protective order is denied as moot. The Grand Rounds Report would only be relevant if this case had proceeded.