Penny D. MILLER, Plaintiff,

v.

TACO BELL CORP., Defendant.

No. CV 99–6590.

United States District Court,
E.D. New York.

May 15, 2002.

Finder & Cuomo, LLP, By Patrick W. McGinley, Esq., New York, for Plaintiff.

Strongin Rothman & Abrams, LLP, By Barry S. Rothman, Esq., Florham Park, NJ, for Defendant.

*MEMORANDUM AND ORDER*

WEXLER, District Judge.

This is an employment discrimination case in which Plaintiff Penny D. Miller

("Plaintiff" or "Miller") claims discrimination based upon a disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12102 (the "ADA") and the New York State Human Rights Law. Plaintiff was employed by Defendant Taco Bell Corporation ("Taco Bell" or "Defendant") from 1989 through 1998. She alleges that he was denied a promotion and later terminated on account of her disability. Plaintiff's claims of discrimination are based upon an actual disability, a record of disability and a perception of disability. Additionally, Plaintiff claims that she was subject to a hostile work environment.

Presently before the court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted and the case is dismissed.

## BACKGROUND

### I. Factual Background

The facts upon which the court relies are those set forth in Plaintiff's complaint as well as in the various depositions and uncontroverted documents submitted to the court in support of and in opposition to the motion.

### II. Plaintiff's Complaint

Plaintiff's claim of disability is based upon a hearing impairment, referred to by her physician as a "severe bilateral sensorineural hearing loss." Plaintiff has suffered from this permanent impairment since she was approximately two years of age. To understand what people are saying, Plaintiff utilizes a hearing aid and reads lips.

Although she was hired by Taco Bell when suffering from her hearing impairment, Miller alleges that she was denied a promotion opportunity and ultimately terminated on account of her alleged disability. She further alleges that certain Taco Bell employees created a hostile working environment for her by teasing her about her inability to hear. Plaintiff seeks compensatory and punitive damages as well as an award of costs and attorneys' fees.

### III. Defendant's Motion

Defendant seeks summary judgment dismissing Plaintiff's complaint in its entirety. First, judgment is sought on the ground that despite Plaintiff's hearing loss, she is not disabled under the ADA. Assuming Plaintiff suffers from an ADA disability, judgment is nonetheless sought on the ground that Plaintiff has failed to allege facts in support of even a minimal showing of discrimination. Even if such a showing has been made, Defendant contends that it has demonstrated legitimate non-discriminatory reasons for its employment decisions with respect to Plaintiff and Plaintiff cannot show that such reasons were pretextual.

## DISCUSSION

### I. Legal Principles

#### A. Standards For Summary Judgement

A motion for summary judgement is properly granted only if the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FRCP 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking judgment bears the burden of demonstrating that no issue of fact exists. *McLee v. Chrysler Corp.* 109 F.3d 130, 134 (2d Cir.1997). However, when the nonmoving party fails to make a showing on an essential elements of its case with respect to which it bears the burden of proof, summary judgment will be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986). The party resisting summary judgment must not only show a disputed issue of fact, but it must also be a material fact in light of substantive law. Only disputed facts that "might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505.

In cases alleging employment discrimination, where intent is at issue, summary judgment is approached with caution. Nonetheless, where an employer provides "convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer." *Ralkin v. New York City Transit Authority*, 62 F.Supp.2d 989, 997 (E.D.N.Y.1999); *see McLee*, 38 F.3d at 68; *see also Baluta v. Hicksville Union Free School District*, 2000 WL 335770 *3 (E.D.N.Y. March 15, 2000).

### B. Burden Shifting Analysis

Claims of employment discrimination brought pursuant to the ADA are subject to the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Heyman v. Queens Village Committee for Mental Health*, 198 F.3d 68, 72 (2d Cir.1999); *Rivera v. Apple Industrial Corp.*, 148 F.Supp.2d 202, 211 (E.D.N.Y.2001).

Under the *McDonnell Douglas* analysis, the plaintiff bears the burden of showing a *prima facie* case of discrimination. The burden of production then shifts to defendant to offer a nondiscriminatory reason for the employment action. Thereafter, it is for the plaintiff to show that the reason offered by defendant is a pretext for discrimination. The plaintiff's final burden is satisfied either by the introduction of addi-

tional evidence or by reliance on the evidence submitted in support of the *prima facie* case. *Heyman*, 198 F.3d at 72; *see Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### C. Elements of an ADA Claim

To state a *prima facie* case of ADA discrimination, a plaintiff must show: (1) that he is an individual with a disability within the meaning of the statute; (2) that his employer is subject to the ADA and had notice of the disability; (3) that he was otherwise qualified to perform the essential functions of his position, with or without reasonable accommodation; and (4) that he was fired or suffered adverse employment action because of the disability. *Heyman*, 198 F.3d at 72; *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998); *Sacay v. Research Foundation of the City University of New York*, 44 F.Supp.2d 496, 500 (E.D.N.Y.1999); *see Parker v. Columbia Pictures Indust.*, 204 F.3d 326, 332 (2d Cir.2000).

#### i. Disability Within the Meaning of the ADA

The ADA defines disability as: (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities; (2) a record of such an impairment or (3) being perceived or regarded as having such an impairment. 42 U.S.C. § 12102(2); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450; *Schaefer v. State Ins. Fund*, 207 F.3d 139, 142 (2d Cir.2000); *Ryan*, 135 F.3d at 869; *Zuppardo v. Suffolk County Vanderbilt Museum*, 19 F.Supp.2d 52, 54 (E.D.N.Y.1998), *aff'd*, 173 F.3d 848 (2d Cir.1999). Whether a plaintiff's claim is based upon actual, recorded or perceived disability, the dis-

ability at issue must be a disability as defined by the ADA.

When determining whether a plaintiff suffers from an ADA disability, courts focus first on whether plaintiff suffers from an impairment. Second, the court determines whether the life activity identified by the plaintiff constitutes a "major life activity" under the ADA. Finally, the court considers whether plaintiff is "substantially limited" in the identified major life activity. *Colwell v. Suffolk County Police Department,* 158 F.3d 635, 641 (2d Cir. 1998); *see Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Epstein v. Kalvin–Miller Internat'l., Inc.,* 100 F.Supp.2d 222, 225–27 (S.D.N.Y.2000); *Rivera,* 148 F.Supp.2d at 212.

Physical impairments that might amount to a disability include physiological disorders or anatomical losses affecting one or more of the body's systems, including, *inter alia,* the special sense organs. *See* 29 C.F.R. § 1630.2(h)(1). The requirement that a plaintiff identify a "major" life activity affected by his impairment ensures that only significant impairments are protected under the ADA. *Colwell,* 158 F.3d at 642, quoting, *Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144, 152 (2d Cir. 1998). Major life activities include functions such as caring for oneself, performing manual tasks, seeing, hearing, speaking and breathing, 29 C.F.R. § 1630.2(j); *see Ryan,* 135 F.3d at 870. On the other hand, activities such as playing golf, shopping and performing housework are not considered to be "major life activities." *Colwell,* 158 F.3d at 643.

The "substantial limitation" inquiry is fact specific. *Colwell,* 158 F.3d at 642. Those who are substantially limited in major life activities are either unable to perform such activities or "significantly restricted as to the condition, manner or duration" under which the activity may be performed, when compared with the condition, manner or duration under which the average person in the general population can perform that same major life activity. *See* 29 C.F.R. § 1630.2(j)(1). When determining whether there is a substantial limitation, the court considers: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment and (3) the permanent or long term impact resulting from the impairment. *Id.* § 1630.2(j)(2).

The case-specific inquiry central to the substantial limitation question also requires the court to consider the impact of corrective measures on a plaintiff's condition. *Schaefer v. State Ins., Fund,* 207 F.3d 139, 142 (2d Cir.2000). This includes the use of devices such as eyeglasses, contact lenses and medications. *See Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); *Sutton v. United Air Lines,* 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Even the body's own coping systems must be taken into account when determining the extent of any limitation. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). The degree of correction afforded by use of such devices may result in a finding that the impairment does not act as a substantial limitation on the major life activity claimed. *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139; *e.g., Epstein v. Kalvin–Miller Internat'l., Inc.,* 100 F.Supp.2d 222, 226 (S.D.N.Y.2000) (when plaintiff's diabetes was treated he suffered no substantial limitation in any major life activity).

ii. *Record of a Disability*

Even if a Plaintiff is not actually disabled within the meaning of the ADA, he may nonetheless have a claim if he can show a record of an ADA disability. A record sufficient to establish an ADA

claim, however, must document a disability within the meaning of the ADA. Thus, even if a plaintiff is not actually substantially limited in a major life activity, a record reflecting such a limitation is sufficient to establish a disability under the ADA. A "record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough." *Colwell*, 158 F.3d at 645. Where the record relied upon reveals no greater limitation than that experienced by an individual who is not substantially limited in a major life activity, the ADA "record of a disability" claim must fail. *Id.*

### iii. *Regarded as Having a Disability*

Finally, an ADA plaintiff properly alleges disability where it can be shown that an employer regarded the plaintiff as having a disability. Determination of whether a plaintiff is "regarded" as having a disability turns not upon whether plaintiff actually suffers from a disability, but upon the employer's intent. *Colwell* 158 F.3d at 646. Like a record of a disability, however, a perception of a disability must, in fact, be a perception of a disability within the meaning of the ADA. *Id.* That is, the plaintiff must be perceived as being substantially limited in a major life activity.

### iv. *Stating A Hostile Work Environment Claim*

A hostile work environment exists in a workplace that is "permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Torres v. Pisano*, 116 F.3d 625, 630–31 (2d Cir.1997), quoting, *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Georgy v. O'Neill,* 2002 WL 449723 *10 (E.D.N.Y. March 25, 2002). Factors to consider when determining whether conduct alleged rises to the level of a hostile environment include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's work. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–69 (2d Cir.1998). Conduct that is "merely offensive," but does not constitute an environment that a reasonable person would find abusive, is not conduct that constitutes a hostile work environment. *See Torres,* 116 F.3d at 631.

## II. The Extent of Plaintiff's Impairment: *Plaintiff's Testimony and That of Her Treating Physician*

### A. *Plaintiff's Description of Her Disability*

Plaintiff's allegations of disability stem from her hearing impairment. It is undisputed that Plaintiff has suffered from a hearing impairment since approximately two years of age. At her deposition, Plaintiff requested no need for a sign language interpreter or a special amplification device. Instead, Plaintiff asserted that she would be able to understand counsel's questions so long as she could see his lips. Plaintiff testified that while she has been prescribed hearing aids for both of her ears, at the present time, she uses only one aid because the use of two gives her headaches.

### B. *Physicians' Opinions Describing the Extent of Plaintiff's Disability*

In addition to Plaintiff's testimony there are, before the court, the opinions of two physicians—Dr. Dominick Sampogna, Plaintiff's treating physician, and Dr. Peter Berman, a physician who conducted an independent medical examination of Plaintiff on behalf of Defendant.

Dr. Sampogna, who has been treating Plaintiff's hearing problem since 1976, describes her condition as a "chronic sensorineural hearing loss that involves the inner ear and the nerve leading to it."

Miller's speech reception threshold is stated as 60 decibels in the right ear and 80 decibels in the left ear. While Dr. Sampogna does not state what a normal hearing person's speech reception threshold is, he states that someone would have to shout for Plaintiff to hear. He further states, that without hearing aid amplification, Miller is "profoundly deaf." Dr. Sampogna notes that in addition to use of a hearing aid, Miller lip reads. He comments that while the use of these methods allows Plaintiff to communicate, she does not, even with the use of aids, have the same kind of hearing as an average person in the community, as there is a "loss of nuance in language and a loss of the complete sounds of language."

Dr. Berman, Defendant's examining physician, is in agreement with Dr. Sampogna's assessment as to the degree of Plaintiff's hearing impairment without the use of assistive devices. Indeed, he comments that without the use of hearing aids or visual cues (lip reading), Miller evidences a 95% hearing loss. Such a loss is likely what Dr. Sampogna refers to when he comments that Plaintiff is "profoundly deaf."

After opining as to the degree of Plaintiff's hearing loss without the use of assistive devices, Dr. Berman's report relates the results of tests conducted while Plaintiff used such devices. Specifically, Dr. Berman concludes that the use of a single hearing aid along with lip reading results in "excellent speech discrimination," and a score of 100% on Plaintiff's audiological assessment. When using a hearing aid alone, without the visual cue of lip reading, Dr. Berman assessed Plaintiff's hearing at 83% of normal. Based upon his audiological tests, Dr. Berman's report concludes that, with the use of the mitigating measures of a hearing aid and lip reading, Plaintiff is "a highly functioning hearing impaired individual and is not substantially limited in her hearing."[1]

## C. *Plaintiff's Employment*

Plaintiff was employed by Taco Bell from 1989 through 1998. At the time of her deposition, Miller was employed as a receptionist where her duties include answering telephones and making appointments. She states that she uses an amplifier attached to the telephone, which device allows her to hear. Prior to her present position, Plaintiff was employed as a secretary. At this position, she also used a telephone amplification device.

## D. *Plaintiff's Testimony Regarding Her Employment at Taco Bell*

Plaintiff was hired as a Taco Bell crew member in 1989 by general manager Ted Nanos. Nanos remained Miller's manager throughout her employment and, indeed, was the person who made the decision to terminate Miller in 1998. Plaintiff testified that when she first met Nanos, he appeared "amazed" to learn that she was hearing impaired. Plaintiff attributed Nanos' amazement to the fact that she was such a good lip-reader and spoke so well that people were often surprised to learn of her hearing impairment.

While employed at Taco Bell, Plaintiff spent most of her time in the food preparation area (the "prep" area). Plaintiff stated that she preferred working in the prep area because she found it difficult to hear and interact with customers ordering food at the front register. While Nanos encouraged Plaintiff to work at the front

---

1. In support of her substantial limitation claim Plaintiff also submits the affidavit of her mother who recounts Plaintiff's childhood and school experiences. The court rejects this hearsay affidavit as irrelevant on the ground that it neither discusses major life activities nor Plaintiff's experiences while working at Taco Bell.

register, this was not something that she was interested in pursuing.

Plaintiff supports her allegations of a hostile work environment by relating incidents that took place during the second or third year of her employment with Taco Bell. Specifically, she testified that during this time period, Nanos and other crew members teased her by putting their hands in front of their mouths when they spoke. Plaintiff states that this was done to prevent her from lip reading and to make her think that her co-workers were gossiping about her.

At some point in 1994, Plaintiff alleges that she began to explore the possibility of applying for a promotion to the position of shift manager. She approached Nanos who provided her with the manual necessary to study for a test. Although Plaintiff was interested in pursuing the managerial position, she expressed doubts about her ability to manage a late shift which would require her to close the store. Miller states that she was afraid to close the store late at night because she would be unable to hear an intruder at that hour and would fear for her safety. Nanos is alleged to have ignored Miller's repeated requests to take the manager's exam and, instead, hired others to fill the position. Miller attributes Nanos' lack of support to unlawful discrimination.

Incidents that directly preceded Miller's termination took place in May of 1998 during disputes with Nanos. According to Nanos, Miller used profane language during more than one verbal altercation. Miller does not dispute that the incidents occurred, but denies the use of profanity. When Miller was told by Nanos that she lacked "communication skills," Plaintiff took this as a direct reference to her inability to hear.

### E. *Plaintiff's Written Employment Record*

Plaintiff's extensive written employment record, including reviews spanning the course of Plaintiff's employment, is before the court. These records are favorable in many respects—Miller is invariably referred to as efficient, on time, and neat. Indeed, Plaintiff was employed by Taco Bell for eight years and consistently received hourly salary increases. Nonetheless, Miller's performance reviews paint a picture of an employee who was repeatedly cited for a lack of interpersonal skills.

The vast majority of Miller's ratings in the "communication" area of her performance reviews were generally negative. For example, the remarks section of one review states that Miller "needs to learn to listen and discuss problems instead of getting mad right away." That same review also refers to Miller as "sometimes too stubborn to talk." A 1992 review gives Miler low marks on personal adaptability and, although referring to her as an excellent worker, states that she often showed resistance to direction. When referring to a low mark on communication skills, another review states, "this is no reflection on your hearing problem. However, it is a reflection on your inability to be flexible." Again commenting on personal adaptability, a 1993 review comments that "Penny needs to grow as an individual and a team member" and she "needs to listen to others."

An extensive review was written in October of 1995. That review refers directly to Miller's chances for advancement and states that "Penny could be a shift manager if her interpersonal skills were a little bit better." The letter refers to Miller's treatment of a co-worker as unfair and stated that this individual should not be treated "like dirt." A 1996 review, like earlier reviews, reflects on Miller's com-

munication skills, commenting that she is "sometimes stubborn" and "can sometimes try to be nicer." By 1997, Miller's reviews refer to her communication skills as "needing work" and comments that her personal adaptability suffers from the "same old problems." These concerns are echoed in Miller's April 1998 review which refers to her personal adaptability as "not good" and comments that she "comes across as nasty."

### III. *Disposition of the Motion*

#### A. *Plaintiff's Prima Facie ADA Case*

■ The first element of Plaintiff's prima facie ADA case turns upon whether or not her condition constitutes a disability within the meaning of the ADA. In this analysis, the court notes that there is no question but that Plaintiff suffers from an ADA "physical impairment" and that such impairment has an effect on Plaintiff's ability to hear, clearly an ADA "major life activity." *See* 29 CFR 1630.2(h)(1) (defining physical impairment to include physiological disorders or conditions affecting special sense organs); 29 CFR 1630.2(i) (hearing as an example of a "major life activity").

#### i. *Substantial Limitation*

What remains to be determined is whether Plaintiff is substantially limited in the major life activity of hearing. As noted, those who are substantially limited in major life activities, within the meaning of the ADA, are either unable to perform such activities or significantly restricted as to the manner or duration under which the activity may be performed. *See* 29 C.F.R. § 1630.2(j)(1).

Plaintiff's condition is permanent and is unlikely to change for the better. While she is most certainly deaf and disabled (within the meaning of the ADA), when using no hearing aid, the court must consider Plaintiff's condition as she functions on a daily basis, that is, with the use of her hearing aid and lip reading. *Accord Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir.1999) (remanding hearing disability case for purpose of determining extent of hearing limitation with use of hearing aid). Although Doctor Berman opines that Plaintiff's hearing would be even more improved if she used two hearing aids, Plaintiff states that the use of two aids gives her headaches and she therefore uses only a single aid. Accordingly, the court will not consider the effect of two hearing aids on Plaintiff's ability to hear.

Plaintiff's ability to function, despite her hearing limitation, is apparent. She has a driver's license and been employed in jobs held by individuals who do not suffer from any hearing impairment. Indeed, her two most recent positions—secretary and receptionist—required her to interact with members of the public, both in person and telephonically. It matters not that Plaintiff is provided with an amplifier when using the telephone at work. This is but another assistive device to be considered when determining substantial limitation.

The evidence before the court, especially Plaintiff's ability to maintain employment, might lead the court to conclude that Plaintiff is not disabled within the meaning of the ADA. However, despite Plaintiff's ability to work, her treating physician has at least raised a triable issue of fact with respect to the substantial limitation issue. It is unclear, in the context of this motion for summary judgment, whether the way in which Plaintiff hears and communicates with others can be considered substantially limiting. For the purpose of this motion, therefore, the court holds that Plaintiff has set forth a prima facie case of disability and a triable issue of fact precludes summary judgment on the issue of whether or not Plaintiff is disabled.

### ii. *Termination Because of a Disability*

Despite a finding of a question of fact as to disability, the court holds that Plaintiff has not set forth a prima facie case of discrimination under the ADA. This is because, even assuming Plaintiff suffers from (and/or was regarding as suffering from), an ADA disability, she cannot make even the minimal prima facie showing that she was subject to adverse employment action because of her disability.

Plaintiff's claim that she was denied a promotion beginning in 1994, and was terminated on account of her hearing disability, rests on two assertions. First, she alleges that individuals without hearing impairments were promoted to the position she sought. Second, Plaintiff relies upon the comment made by Nanos regarded her lack of "communication skills." Neither of these assertions supports the claim that Plaintiff suffered adverse employment action because of her disability.

With respect to any failure to promote claim, it is significant that Plaintiff never actually applied for the position of shift manager. While she claims that Nanos did not encourage her to seek this position, there is no claim that his cooperation was necessary for her to apply for the position. Miller was supplied the manual and could have asked to take the promotion exam, with or without the encouragement of Nanos.

Where, as here, a plaintiff alleges a failure to promote, she must show that she applied for a specific position. It is insufficient to state that she "generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998). Because there was never an actual promotion application and denial thereof, Plaintiff cannot claim that she was denied a promotion on account of her disability. *Id.;* *see also Ramos v. Marriott Internat'l, Inc.*, 134 F.Supp.2d 328, 341 n. 6 (failure to promote claim not stated where plaintiff submitted no evidence that she applied for position).

Nor does Nanos' comment regarding Plaintiff's lack of communication skills raise an inference of discrimination. When considered in the context of Plaintiff's extensive employment record spanning several years, it is clear that this comment referred, not to Plaintiff's hearing impairment, but to a lack of interpersonal skills. As demonstrated above, Plaintiff's employment record is replete with references to the need to improve her ability to properly and politely communicate with her co-workers. While Plaintiff was an exemplary employee in some respects, she was far from a model employee with respect to her ability to communicate with others. No question of fact is raised with respect to the meaning of any comment referring to Miller's inability to communicate—it clearly made no reference to her hearing impairment.

Not only do neither of the facts relied upon by Plaintiff support an inference of discrimination, the evidence is clear that Plaintiff's hearing impairment played no role in any employment decision. Miller was hired by Nanos and worked for him for nine years prior to her termination. All the while, Nanos, who also ultimately terminated Miller, had full knowledge of her hearing problems. This fact alone militates strongly against a finding of discrimination. *See Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir.1997) (where same person hired and fired plaintiff, it is "difficult to impute . . . an invidious motivation"). Rather than erect barriers, Nanos encouraged Miller to try new positions at the restaurant. If Plaintiff did not pursue these positions, it was by her own choice and not the result of any discriminatory motive.

■ Even if the thin evidence relied upon by Plaintiff were sufficient to support a prima facie case, other evidence before the court more than rebuts any such inference. Specifically, Plaintiff's lack of interpersonal skills, as amply demonstrated in her performance reviews, support Defendant's decision to fail to promote and/or terminate Plaintiff's employment at Taco Bell. No showing made by Plaintiff supports any notion that these reasons were a pretext for discrimination. *Accord Baluta v. Hicksville Union Free School District*, 2000 WL 335770 *5 (March 15, 2000) (appropriate to consider written employment record when considering *McDonnell Douglas* issues including prima facie showing, rebuttal of such showing and pretext).

In sum, Plaintiff has failed to set forth a prima facie case of discrimination based upon a disability. Even assuming that Plaintiff is disabled within the meaning of the ADA, she sets forth no evidence sufficient to support a finding that any employment action taken by Defendant was on account of her disability. Defendant, on the other hand, has more than supported its employment decisions with non-discriminatory reasons. Accordingly, Plaintiff's ADA claims, whether based upon an actual, perceived or recorded disability, must be dismissed.

### B. *Hostile Environment Claim*

■ An employment discrimination claim based upon a hostile working environment requires a showing of more than sporadic, offensive behavior. *Torres v. Pisano*, 116 F.3d 625, 630–31 (2d Cir.1997), quoting, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767–69 (2d Cir. 1998). Plaintiff's allegations of a hostile work environment are supported by incidents that took place during the second or third year of her employment. During this time period, Plaintiff alleges that she was teased by her co-workers who covered their mouths when they spoke.

These allegations, even if accepted as true, do not rise to the level necessary to support a claim of a hostile working environment. While such actions might be offensive, they were clearly sporadic in nature and not so objectionable conduct as to "alter the conditions of the [Plaintiff's] employment." *Torres*, 116 F.3d at 630–31; *Georgy v. O'Neill*, 2002 WL 449723 *10 (E.D.N.Y. March 25, 2002). Accordingly, the claim of a hostile working environment is dismissed.

### C. *State Law Claims*

In light of the dismissal of all of Plaintiff's federal claims, it would be inappropriate to exercise supplemental jurisdiction over the claims asserted pursuant to New York State Law. *Giordano v. City of New York*, 274 F.3d 740, 754–55 (2d Cir.2001) (error for district court to exercise supplemental jurisdiction over plaintiff's state law claims where federal disability claims were dismissed). Accordingly, the court dismisses Plaintiff's state law claims without prejudice to pursuing those claims in state court.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motion for summary judgment and to close the file in this matter.

SO ORDERED