198 F.3d 68 (2nd Cir. 1999)
 ROBERT HEYMAN, Plaintiff-Appellant,
v.
QUEENS VILLAGE COMMITTEE FOR MENTAL HEALTH FOR JAMAICA COMMUNITY ADOLESCENT PROGRAM, INC., THOMAS WHITE, TYRONE PALMER, and RANDALL JOHNSON, Defendants- Appellees.
 Docket No. 99-7321
August Term, 1999
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: Oct. 19, 1999
Decided: Nov. 30, 1999
 
 Appeal from a judgment of the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., Judge), granting defendants' motion for summary judgment on plaintiff's claim under the Americans with Disabilities Act ("ADA") and declining to exercise supplemental jurisdiction over plaintiff's claims under New York State and local law. The District Court held that plaintiff had not established a prima facie case that he was disabled within the meaning of the ADA. We conclude that plaintiff has established a prima facie case that he was disabled under the statutory definition because he was "regarded as" impaired.
 Vacated and remanded.
 MITCHEL H. OCHS, Anderson & Rottenberg, P.C., New York, NY, for Plaintiff-Appellant.
 ALAN C. BECKER, Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY (Kathryn J. Russo, of counsel), for Defendants-Appellees.
 Before: WALKER, CABRANES, and KATZMANN, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 The question presented is whether an employee who was known by his employer to have lymphoma, but who had not become symptomatic at the time he was fired, can proceed with a discriminatory discharge claim under the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. ("ADA").
 
 
 2
 Plaintiff Robert Heyman appeals from a judgment of the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., Judge), granting defendants' motion for summary judgment on plaintiff's claim under the ADA and declining to exercise supplemental jurisdiction over plaintiff's claims under New York State and local law. The District Court held that plaintiff had not established a prima facie case that he was "disabled" as the term is defined under the ADA. We conclude that plaintiff has established a prima facie case that defendants regarded him as impaired, thus satisfying one of the statutory definitions of "disabled." Accordingly, we vacate the judgment and remand for further proceedings.
 
 I.
 
 3
 Plaintiff filed this discriminatory discharge action against defendants Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc. ("J-CAP"), Thomas White, Tyrone Palmer, and Randall Johnson on May 30, 1997. Heyman, a former J-CAP employee who worked under the supervision of the individual defendants, claims that his discharge from J-CAP violated the ADA; the New York State Human Rights Law, N.Y. Exec. Law 290 et seq.; and the New York City Human Rights Law, Admin. Code 8-101 et seq. In granting defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56(b) on Heyman's ADA claim and declining to exercise supplemental jurisdiction over his state and local claims, the District Court held that Heyman had not established a prima facie case that he suffered from a "disability" as that term is defined under the ADA.
 
 
 4
 The facts set forth below are drawn from the papers submitted to the District Court on defendants' motion for summary judgment and are undisputed unless otherwise stated. Heyman was employed on June 17, 1994 as a Medical Unit Administrator by J-CAP, a facility providing medical and health care services. He had primary responsibility for the administration and functioning of J-CAP's ambulatory services facility.[1] In his J-CAP job application, Heyman acknowledged that if he were selected as Medical Unit Administrator he would serve as an at-will employee.
 
 
 5
 When Heyman initially began his job at J-CAP, his immediate supervisor was Gary McCormick, Associate Executive Director and Chief Operating Officer of J-CAP. However, shortly after Heyman's arrival, McCormick was diagnosed with lymphoma; he died in or about April 1995. While McCormick often was absent from work during the ten months between his diagnosis and ultimate demise, J-CAP took no employment action against him.
 
 
 6
 When Heyman joined J-CAP, it had in place a written Personnel Policy and Procedure Manual. The Manual set forth J-CAP's policy of placing newly-hired employees on probationary status for their first six months on the job. At the conclusion of this period, each new staff member was supposed to receive a written evaluation from his supervisor before becoming a "regular employee." According to the Manual, J-CAP also required supervisors to complete annually an Employee Performance Evaluation Form for each employee, to review it with the evaluated employee, and to have him sign the form to acknowledge the review. The Manual provided also that it was J-CAP's policy that employees could be terminated for "[u]nsatisfactory work performance based upon supervisory evaluations." Heyman claims never to have been reviewed, and defendants have not brought to our attention any evidence of a review, annual or otherwise.
 
 
 7
 In September 1995, about five months after the death of McCormick, Heyman received from a J-CAP physician a preliminary diagnosis that he suffered from lymphoma. After this diagnosis was confirmed the following month, Heyman spoke about his condition with defendant Johnson, J-CAP's Director of Grants and Contracts. At his deposition, Johnson explained, "[H]e said could I keep it between us, he was going in for chemotherapy. He needed special accommodations in terms of leave and things like that. I said, don't worry about it." Heyman claims he subsequently informed defendant White, J-CAP's Executive Director, that Heyman suffered from lymphoma.
 
 
 8
 On October 27, 1995, Heyman notified Johnson and White that he planned to arrive late for work on November 2 due to a medical appointment. On November 7, 1995, Johnson informed Heyman by memorandum of the hiring of Paul Woodard to replace the deceased McCormick and requested that Heyman contact Johnson to set up a meeting, explaining: As the person responsible for the oversight of the Article 28 Medical Unit, it is important that we meet to discuss your role and performance in furthering the operation and development of this unit. The level of time and commitment required to resolve the ongoing internal problems in the unit is an area of critical concern that must be addressed immediately.
 
 
 9
 (emphasis supplied). Johnson and Woodard met with Heyman the next day; Heyman claims that his illness was discussed at the meeting, a contention that defendants dispute. Johnson then sent Heyman a memorandum in which Johnson informed Heyman that "[b]ased upon our meeting today, and subsequent discussions with the Executive staff, it has been summarily decided to terminate your employment as Medical Unit Administrator effective the end of the work day."
 
 
 10
 Unsurprisingly, the parties vigorously dispute why Heyman was discharged. Defendants claim that Heyman was dismissed because: (1) the unit for which he was responsible was underperforming; (2) he was perceived by management, peers, and subordinates as abrasive and arrogant; (3) he was unwilling or unable to train and motivate his staff; (4) his conduct was believed to have been motivated by racial or ethnic prejudice; (5) a year earlier, he had not fired a nurse despite being directed to do so; and (6) he tailored his work schedule to avoid traffic during his daily commutation to J-CAP, rather than ensuring that he was present to supervise his staff properly. Heyman responds that these purported reasons are mere pretexts manufactured post hoc for litigation purposes and are not supported by contemporaneous evidence.
 
 
 11
 In support of his prima facie case that his discharge was discriminatory, Heyman notes that he never had received a negative performance evaluation during his tenure at J-CAP. He also points out that the sole contemporaneous document mentioning a possible reason for his termination, Johnson's November 7 memorandum, expresses only a concern over "the level of time and commitment" Heyman would be expected to devote to his job. Attempting to prove that this phrase concerned his health rather than other aspects of his job performance, Heyman has produced time sheets demonstrating that he worked 52 weeks the previous year and logged hours in excess of those required of him. Heyman also points to the temporal proximity between (1) J-CAP's experience with McCormick's lymphoma; (2) Heyman's own request for "special accommodations;" and (3) his notifying Johnson and White that he would miss work for a medical appointment on the morning on November 2, 1995 on the one hand, and the November 7 memorandum and his summary firing on the other, as evidence that defendants' proffered reasons are pretextual and are designed to obscure defendants' discriminatory intent in discharging him.
 
 
 12
 After the completion of discovery, defendants moved for summary judgment. Judge Johnson granted the motion and entered judgment in defendants' favor on March 5, 1999. This appeal followed.
 
 II.
 A. Applicable Standards
 1. Summary Judgment
 
 13
 We review de novo the District Court's decision to grant defendants' motion for summary judgment. See Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996). We cannot uphold the Court's decision unless we determine that there exists no genuine issue of fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994). In assessing the record, we are required to resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 2. Employment Discrimination
 
 14
 As the Supreme Court recently reiterated, "[t]he ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees . . . .'" Sutton v. United Air Lines, Inc., 119 S. Ct. 2139, 2144 (1999) (quoting 42 U.S.C. 12112(a)).
 
 
 15
 In analyzing a discriminatory discharge claim under the ADA, we apply the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (applying McDonnell Douglas to ADA claim). Under McDonnell Douglas, plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. See Chambers, 43 F.3d at 37. The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. See id. at 38. Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." Id. (internal quotations and citations omitted).
 
 
 16
 To establish a prima facie case of discrimination under the ADA, plaintiff must show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998). The sole dispute before the District Court concerned whether Heyman was disabled within the meaning of the ADA. Under the statute, "disability" is defined as:
 
 
 17
 (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;
 
 
 18
 (B) a record of such an impairment; or
 
 
 19
 (C) being regarded as having such an impairment.
 
 
 20
 42 U.S.C. 12102(2) (emphasis supplied). The Equal Employment Opportunity Commission ("EEOC"), the agency with principal responsibility for the enforcement of the ADA and to whose interpretation of the statute we are required to accord great deference, see Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999), has defined a "physical impairment" under the statute as:
 
 
 21
 Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.
 
 
 22
 29 C.F.R. 1630.2(h)(1). The EEOC has defined "substantially limits" to mean:
 
 
 23
 (i) Unable to perform a major life activity that the average person in the general population can perform; or
 
 
 24
 (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
 
 
 25
 29 C.F.R. 1630.2(j)(1). Finally, the EEOC has provided that "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(i) (emphasis supplied).
 
 B. Analysis
 
 26
 While the District Court analyzed in some detail, and rejected, Heyman's claim that at the time he was fired he was disabled within the meaning of 42 U.S.C. 12102(2)(A) (i.e., actually impaired), the Court paid scant attention to his alternative argument that he was disabled within the meaning of 12102(2)(C) (i.e., regarded as impaired).
 
 
 27
 As we have noted,
 
 
 28
 [a] plaintiff cannot state a claim under the "regarded as" prong of the ADA . . . simply by alleging that the employer believes some physical condition, such as height, weight, or hair color, renders the plaintiff disabled. Rather, the plaintiff must allege that the employer believed, however erroneously, that the plaintiff suffered from an "impairment" that, if it truly existed, would be covered under the statute[] and that the employer discriminated against the plaintiff on that basis.
 
 
 29
 Francis v. City of Meriden, 129 F.3d 281, 285 (2d Cir. 1997). We are persuaded, drawing all reasonable inferences in Heyman's favor, that a reasonable trier of fact could conclude by a preponderance of the evidence that defendants regarded Heyman as suffering from a physical impairment (lymphoma) that significantly restricted his ability to perform the major life activity of work. In these circumstances, a reasonable jury could determine, on the basis of the evidence in the record, that defendants believed that Heyman's lymphoma would reduce significantly his ability to work. Not long before Heyman's discharge, McCormick had had a long struggle with lymphoma that culminated in his death. During his illness, McCormick missed a good deal of work and, the jury could infer, was unable to complete the tasks for which he was responsible. A jury could find that Defendants' experience of having allowed McCormick to continue at J-CAP despite his lymphoma and the resulting inability to perform all of his duties led defendants to conclude that Heyman, afflicted with the same disease, would likewise be unable to function fully and soon would become a workplace liability.
 
 
 30
 The jury could support this conclusion by looking to the only contemporaneous evidence offering a reason for firing Heyman: Johnson's November 7, 1995 memorandum noting defendants' concern over the "level of time and commitment required" of Heyman. Inasmuch as Heyman has presented evidence that he had previously had a sterling attendance record and had worked longer hours than required, a reasonable jury could conclude that the concern expressed by Johnson was engendered by a fear that Heyman's lymphoma would render him unable to complete his assigned tasks, as it had McCormick. The absence of any negative written performance evaluation prior to Heyman's diagnosis also could support such an inference. This conclusion could further be bolstered by the fact that Heyman had asked Johnson to make "special accommodations" for time off to be treated for lymphoma, and that shortly before he was fired Heyman notified Johnson and White that he would miss his first morning of work for a medical appointment.
 
 
 31
 Viewing this evidence as a whole and drawing all reasonable inferences in plaintiff's favor, we believe a reasonable jury could conclude that defendants fired Heyman because they regarded him as suffering from a physical impairment-lymphoma-that significantly restricted Heyman's ability to perform his job. We therefore conclude that the District Court erred in dismissing Heyman's claim for failure to establish a prima facie case of discrimination under the ADA.
 
 CONCLUSION
 
 32
 For the reasons stated above, we conclude that Heyman has established a prima facie case that defendants discharged him because they regarded him as disabled. Accordingly, we vacate the judgment of the District Court and remand the cause for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The parties refer to this facility as an "Article 28 Unit," in reference to the section of the New York State Public Health Law under which the facility is licensed by the state Department of Health.