**Francis L. HOEHN, Plaintiff,**

v.

**INTERNATIONAL SECURITY SERVICES AND INVESTIGATIONS, INC. Defendant.**

**No. 97–CV–974A.**

United States District Court,
W.D. New York.

Nov. 26, 2002.

Mark L. Collins, Buffalo, NY, for Plaintiff.

Harris, Beach & Wilcox, Rochester, NY (Scott D. Piper, of Counsel), for Defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on March 4, 1998. On October 1, 2001, defendant filed a motion for summary judgment. On September 5, 2002, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendant's motion for summary judgment be granted.

Plaintiff filed objections to the Report and Recommendation on September 24, 2002. Defendant filed a response to plaintiff's objections on October 7, 2002. Oral argument on the objections was held on November 19, 2002.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, the Court grants defendant's motion for summary judgment. The Clerk of Court is directed to take all steps necessary to close the case.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This case was referred to the undersigned on March 4, 1998, by Honorable Richard J. Arcara for all pretrial matters including report and recommendation on dispositive motions. The matter is currently before the court on Defendant's motion for summary judgment (Docket No. 61), filed October 1, 2001.

### BACKGROUND

Plaintiff commenced this action by filing the original Complaint on December 11, 1997, seeking, *inter alia*, damages and equitable relief for wrongful termination in

violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("the ADA" or "the Act"), alleging that he was terminated from his employment as an armed security guard/control center operator based on a physical disability, loss of vision in one eye. The original Complaint names International Security Services and Investigations, Inc. ("ISSI") and others as Defendants.[1] Motions to dismiss the Complaint were filed by Defendants on March 2 and 31 1999. By Order filed May 12, 1999, all claims were dismissed as to all Defendants except for the ADA claim against ISSI. (Docket No. 35). On June 9, 1999, Plaintiff filed an Amended Complaint ("the Amended Complaint"), alleging only the ADA claim against ISSI. ISSI filed its answer to the Amended Complaint on June 25, 1999.

On October 1, 2001, ISSI filed a motion for summary judgment (Docket No. 61), together with a Memorandum of Law (Docket No. 62) ("Defendant's Memorandum"), and a Statement of Material Facts Not in Dispute (Docket No. 63) ("Defendant's Statement of Facts"), attached to which are numerous exhibits ("Defendant's Exhibits"). Plaintiff, on November 2, 2001, filed in response to the summary judgment motion a Memorandum of Law (Docket No. 65) ("Plaintiff's Memorandum"). On November 16, 2001, ISSI filed a Reply Memorandum of Law in further support of summary judgment (Docket No.

66) ("Defendant's Reply Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for summary judgment (Docket No. 66) should be GRANTED based on Plaintiff's failure to establish that he is disabled within the meaning of the ADA and the Clerk of the Court should be directed to close the case. Alternatively, a genuine issue of material fact exists regarding whether Hoehn requested a reasonable accommodation for his disability and, if so, whether ISSI properly denied the request, precluding summary judgment.

### FACTS [2]

Plaintiff, Francis L. Hoehn ("Hoehn"), age 69, has had monocular vision since a work-related accident in 1956 left him legally blind in his right eye. After sustaining his eye injury, Hoehn worked as an ironworker, a job which involved erecting the steel structural skeletons of buildings by use of reinforcing steel rods, and welding and riveting or bolting iron beams together. *Id.* at 9–11, 14.[3] Hoehn often worked standing on the iron beams of the steel skeletons at significant heights and, in later years, was required to wear a safety belt. *Id.* at 11. Despite his monocular vision, Hoehn had no work restrictions and was given no special work accommodations. *Id.* at 12.

Hoehn retired from his ironworker job in 1984 and, after a few years, commenced

---

1. Also sued as defendants in the original Complaint were Clayton Williams, Donna M. Metz, Ousama Karawija, Robert Soden, Jane Doe and John Doe. The original Complaint included additional claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("the ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Fifth and Fourteenth Amendments, alleging that Hoehn was discharged from his employment based on his age, gender and racial or ethnic background.

Plaintiff also sought damages under 42 U.S.C. § 1985(3) alleging Defendants conspired to deprive him of his equal protection rights.

2. The fact statement is taken from the pleadings and motion papers filed in this action.

3. "Hoehn Deposition T." references are to the page of the transcript of Hoehn's deposition testimony, a copy of which is attached as Defendant's Exhibit 1.

working for Wells Fargo and Adams Security as an armed security guard, supervising bingo games. Hoehn Deposition T. at 17–19. On July 7, 1988, Hoehn commenced employment as an armed security guard/control center operator ("security guard"), working for various companies under contract with the United States General Services Association ("GSA"), most recently ISSI, to provide security services at federal buildings throughout New York. As a security guard, Hoehn was assigned to the Thaddeus J. Dulski Federal Office Building ("the Dulski building"), in Buffalo, New York, where his job duties included monitoring closed circuit television and alarm systems, dispatching personnel using a portable two-way radio, answering the telephone and performing entry control duties at one of the entrances to the Dulski building by screening visitors for weapons with a magnetometer and inspecting packages and briefcases. It is undisputed that Hoehn, despite his visual deficit, satisfactorily performed all the duties of his security guard job without any accommodation.

On March 1, 1996, ISSI was awarded the competitively bid contract with GSA to provide services at the Dulski building ("the contract"). The contract provided that ISSI would remove any employee from GSA controlled property upon determining that such employee was "unfit to work on GSA controlled property." Contract at 78.[4] This provision is provided for pursuant to 48 C.F.R. § 552.237–71. *Id.* One of the physical fitness requirements for Hoehn's security guard position is

"binocular vision, correctable to 20/20 (Snellen)."[5] Contract at 27. Persons employed as security guards are also required to score a minimum of 220 points out of a possible 300 points on a semi-annual firearms test. It is undisputed that Hoehn consistently scored between 260 and 290 points on these tests during the eight years that he was employed as a security guard.

In August, 1996, GSA required every ISSI security employee, including the security guards assigned to the Dulski building, to undergo physical examinations to ensure such employees were in compliance with the contract's physical requirements. Hoehn underwent the required recertification firearms test and physical examination and the results of those tests were consistent with those of prior years. On a Certificate of Medical Examination ("the medical certificate") completed in connection with Hoehn's examination on August 21, 1996, Dr. Mark Costanza, the examining physician, checked a box next to the statement "No limiting conditions for this job" and wrote "Excluding one eye vision/depth perception." Hoehn maintains that ISSI was aware of his vision deficiency based on prior recertification tests and medical examination reports prepared by his previous employers. The medical certification was forwarded to Robert Soden, GSA's security specialist.

On September 23, 1996, Soden advised ISSI Contract Manager Clayton Willman that Hoehn was unsuitable for the security

---

**4.** A copy of the Contract is attached as Defendant's Exhibit 4.

**5.** "Snellen" refers to the test for visual acuity developed in 1862 by Dutch ophthalmologist Herman Snellen and is comprised on the familiar letter chart used for vision examinations. The first figure in the Snellen score refers to the distance between the viewer and the visual target, typically 20 feet. The second figure corresponds to the distance at which a person with normal acuity could distinguish letters of the size that the viewer can distinguish at 20 feet. STEDMAN'S MEDICAL DICTIONARY, 27th ed. (2000), at 1650, 1813; R. Ausman & D. Snyder, MEDICAL LIBRARY, LAWYERS EDITION, vol. 9 (1992) 2 21:34.

guard position based on his monocular vision and recommended Hoehn be removed from GSA sites. ISSI terminated Hoehn on September 30, 1996. Hoehn then requested a copy of the medical certificate and observed that the check mark in the box next to the statement "No limiting conditions for this job" was crossed out and the box underneath, next to the statement "Limiting conditions as follows" was checked. Dr. Costanza denied altering the medical certificate.

On October 3, 1986, Hoehn telephoned Soden requesting reinstatement. Soden advised Hoehn to put the request in writing and Hoehn complied. GSA received letters from Buffalo GSA officers Kenneth Grzelak and Richard Tully and his ISSI supervisor, Donna Metz, protesting his termination. Hoehn maintains that he also made several telephone calls to Willman regarding the termination of his employment, but that none of the calls were returned. In connection with his reinstatement request, Hoehn also contacted Kenneth Charron, the Federal Protective Services ("FPS") Branch Chief for Upstate New York and the Contracting Officer's Representative for the contract, who directed Soden to inform FPS Director John Ulianko of Hoehn's request. Ulianko denied the request and Soden, on October 18, 1996, spoke to Ben Moultrie, the acting Contracting Officer with regard to the contract, explaining that Hoehn's reinstatement request would require a waiver of the contract's physical requirements. Moultrie denied the waiver, thereby rejecting Hoehn's reinstatement request.

On October 18, 1996, Hoehn filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination in violation of the ADA against ISSI based on disability, monocular vision, and maintaining that he did not fail his physical recertification examination but, rather, the medical certificate was fraudulently altered which resulted in his termination. The EEOC's Notice of Right to Sue, issued June 27, 1997, advised Hoehn that upon investigating the claim, the EEOC found a reasonable belief that ISSI terminated Hoehn in violation of the ADA based on the absence of any evidence that the contract's vision acuity requirement for the security guard position was "job related and consistent with business necessity." EEOC Notice of Right to Sue, Defendant's Exhibit 16.

Meanwhile, on October 29, 1996, Hoehn filed a disability discrimination complaint with GSA alleging unlawful employment termination based on his impaired vision. GSA, on December 3, 1996, advised Hoehn that his claim was being dismissed for failure to state a claim given that Hoehn was neither an employee or applicant for employment with GSA. Rather, Hoehn was advised he had worked for ISSI and that although GSA had requested ISSI remove Hoehn from government worksites based on Hoehn's failure to meet the contract's vision standard, GSA never requested that ISSI terminate Hoehn's employment.

### DISCUSSION

1. **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d

Cir.1999) (citing *Anderson, supra.* at 255, 106 S.Ct. 2505). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra,* at 322, 106 S.Ct. 2548; *see Anderson, supra,* at 247–48, 106 S.Ct. 2505 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. supra,* at 323–24, 106 S.Ct. 2548 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the nonmoving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra,* at 18 (citing cases).

In the instant case, ISSI seeks summary judgment on the basis that Hoehn is unable to establish that he is "disabled" within the meaning of the ADA. Defendant's Memorandum at 2–14. Alternatively, ISSI asserts that Hoehn never requested any reasonable accommodation from ISSI, that ISSI had no authority to issue such accommodation had it been requested, and that the only accommodation that would have permitted Hoehn to retain his employment would have resulted in undue hardship to ISSI. Defendant's Memorandum at 14–17. Finally, ISSI argues that even if Hoehn can establish a *prima facie* case of disability discrimination in violation of the ADA, ISSI is nevertheless entitled to summary judgment because the record is devoid of any evidence that its decision to terminate Hoehn was a mere pretext for unlawful discrimination. *Id.* at 17–19. Hoehn opposes summary judgment, arguing that he should be considered "disabled" under the ADA because his monocular vision substantially limits his major life activities of seeing and working. Plaintiff's Memorandum at 3–10; that he nevertheless meets the "regarded as" prong to be considered disabled under the ADA, Plaintiff's Memorandum at 10–12; and that he not only requested an accommodation from ISSI, but that such accommodation would not have resulted in any undue hardship to ISSI, *Id.* at 12–14.

## 2. *Prima Facie Case of Employment Discrimination Based on Disability*

■ "The ADA prohibits discrimination by covered entities, including private em-

ployers, against qualified individuals with a disability. Specifically, it provides that no covered employer 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... [the] discharge of employees.....' " *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477–78, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 42 U.S.C. § 12112(a)). In analyzing a discriminatory discharge claim under the ADA, courts employ the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999). Under the *McDonnell Douglas* burden-shifting test, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a *prima facie* case of discrimination. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). The burden then shifts to the defendant to prove through admissible evidence a legitimate, non-discriminatory reason for their actions sufficient to support a finding by the trier of fact that unlawful discrimination was not the reason for the disputed employment action. *Id.* at 38. The plaintiff is then required to show that the proffered reason was merely a pretext for the alleged discrimination which "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more." *Id.*

■ To establish a *prima facie* case of discrimination under the ADA, the plaintiff must establish by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; and (4) he suffered an adverse employment action based on his disability. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998). As stated, the parties disagree as to whether Hoehn is disabled within the meaning of the ADA, the second element for establishing a *prima facie* case of employment discrimination under the ADA. "Disability" is defined under the ADA as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

■ In the instant case, the first and third definitions of disability are at issue. Specifically, Hoehn maintains he is disabled because his monocular vision substantially limits his ability to see and work. Plaintiff's Memorandum at 4–10. Hoehn alternatively argues he is disabled under the "regarded as" prong. *Id.* at 10–12. Although ISSI does not dispute that Hoehn's monocular vision is a physical impairment within the meaning of the ADA, Defendant's Memorandum at 3–14; Defendant's Reply Memorandum at 1–6, the mere existence of an impairment does not render one disabled for the purposes of the ADA. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 194–95, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). To qualify as disabled under the ADA, the claimant must also demonstrate that the impairment substantially limits a major life activity. *Id.* (citing 42 U.S.C. § 12102(2)(A)).

## A. *Substantially Limited in a Major Life Activity*

As stated, Hoehn asserts he is disabled because he suffers from a physical impairment, monocular vision, which substantially limits him in the major life activities of seeing and working. Plaintiff's Memorandum at 4–10. Although the ability to see is considered a major life activity, *Sherman v. Peters*, 110 F.Supp.2d 194, 196 (W.D.N.Y.2000), monocular vision is not a *per se* disability within the meaning of the ADA; rather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case-by-case basis and in terms of the impairment's impact on the individual. *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (citing *Sutton, supra*, at 483, 119 S.Ct. 2139). Variables to be considered in making such determination include (1) the degree of visual acuity in the weaker eye; (2) the age at which the vision loss occurred; (3) the extent of the individual's compensating adjustments in visual techniques; and (4) the ultimate scope of the restrictions on the individual's visual abilities. *Kirkingburg, supra*, at 566, 119 S.Ct. 2162. In other words, "the Act requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual fields, is substantial." *Kirkingburg, supra*, at 567, 119 S.Ct. 2162. Nevertheless, "people with monocular vision ordinarily will meet the Act's definition of disability." *Id.* (internal quotation marks omitted).

ISSI asserts that Hoehn has failed to provide any evidence establishing that his monocular vision substantially limits any of his major life activities. Defendant's Memorandum at 3–14; Defendant's Reply Memorandum at 1–6. In support of summary judgment, ISSI points to numerous statements made by Hoehn during his deposition which ISSI maintains establish that Hoehn's monocular vision does not substantially limit any major life activity. In particular, ISSI draws the court's attention to Hoehn's testimony that after sustaining his eye injury in 1956, Hoehn commenced working as an ironworker assembling steel structural skeletons of buildings, by welding, bolting and riveting steel beams together, and that Hoehn often performed such tasks while standing on narrow steel beams as high up as forty floors. Defendant's Memorandum at 4–5 (citing Hoehn Deposition T. at 9–11). Hoehn was able to perform this work without any special accommodations or restrictions. *Id.* at 5 (citing Hoehn Deposition T. at 12–14). Upon retiring from his ironworker job, Hoehn was able to obtain employment as a security guard with various companies. *Id.* (citing Hoehn Deposition T. at 17–18). As a security guard, Hoehn was required to carry a firearm for which he had demonstrated proficient use. *Id.* (citing Hoehn Deposition T. at 21–22). Hoehn, in fact, was consistently ranked as a "sharpshooter," scoring between 260 and 290 out of a possible 300 on the required semi-annual firearms recertification exam, significantly above the requisite score of 220. *Id.* (citing Complaint, ¶ 7, Defendant's Ex. 18). No restrictions were ever placed on Hoehn while he was employed as a security guard and Hoehn never believed he needed any. *Id.* (citing Hoehn Deposition T. at 22–23).

While assigned to the Dulski building, Hoehn worked four nights per week by himself in the control center where he was responsible for supervising eight other security employees and monitored alarms and security cameras displaying views in 4″ × 4″ squares of 100 locations in and

around the Dulski building. Defendant's Memorandum at 5–6 (citing Hoehn Deposition T. at 30, 34–38). Hoehn occasionally would relieve other security employees who patrolled outside the Dulski building at night. *Id.* at 6 (citing Hoehn Deposition T. at 39–40). Hoehn, who experienced no problems observing the monitors, was particularly responsible for observing potential security threats. *Id.* (citing Hoehn Deposition T. at 68–69). Hoehn never had any problems completing the numerous forms reporting his observations as a security guard. *Id.* (citing Hoehn Deposition T. at 30, 71–72). Hoehn worked the day shift on Fridays when he monitored the magnetometer (metal detector) at the Dulski building's Delaware Street door. *Id.* (citing Hoehn Deposition T. at 47). As people filed through the magnetometer, Hoehn was required to observe whether the light within the 1½″ by 6″ window atop the magnetometer flashed, signaling the person passing through may possess a weapon. *Id.* at 6–7 (citing Hoehn Deposition T. at 52). Although monitoring the magnetometer required Hoehn "to be on [his] toes," Hoehn had no difficulty observing the light and did not believe he ever missed anything the magnetometer was designed to detect. *Id.* at 7 (citing Hoehn Deposition T. at 54–55).

ISSI, in support of summary judgment, also points to Hoehn's deposition testimony that his monocular vision presented few limitations outside of his employment. In particular, Hoehn, who continually possessed a driver's license since sustaining his eye injury in 1956, drove without any license restrictions, never had his license revoked, and never had an accident or experienced difficulty parking based on his

monocular vision. Defendant's Memorandum at 7 (citing Hoehn Deposition T. at 67). Hoehn attributes his clean driving record to the fact that he is "just damn careful" and "more observant than someone else might be." *Id.* Hoehn regularly watched football and hockey on television. *Id.* (citing Hoehn Deposition T. at 113). Hoehn's monocular vision caused him no difficulties in walking, although he admitted he was a "little extra cautious" so as not to bump into things. *Id.* (citing Hoehn Deposition T. at 120). Hoehn is generally able to navigate stairs without difficulty, although he fell down the stairs twice in the last ten years. *Id.* at 7 & n. 3 (citing Hoehn Deposition T. at 118–20). Hoehn can shave and otherwise attend to his personal needs without difficulty. *Id.* at 8 (citing Hoehn Deposition T. at 121).

In opposition to summary judgment, Hoehn points to portions of his deposition testimony wherein he describes various physical difficulties caused by his monocular vision. Specifically, Hoehn testified that depth perception difficulties attributed to his monocular vision makes it necessary for him to align any vehicle he is driving with the traffic lines in the road to ensure he drives straight, and causes him difficulty walking, navigating stairs, and playing sports with his grandchildren. Plaintiff's Memorandum at 5 (citing Hoehn Deposition T. at 121–25; 179–81).[6]

As to the impact of Hoehn's monocular vision on his ability to see, the Supreme Court and various courts within the Second Circuit have found similar sight restrictions do not constitute a substantial impairment on one's ability to see so as to render an individual disabled under the

---

**6.** Hoehn also asserts that he testified that he cannot watch television programs without having to leave the room, Plaintiff's Memorandum at 5, although he does not provide any reference for such statement and no such statement is within the portions of Hoehn's deposition transcript submitted by either party with regard to the instant summary judgment motion.

first prong of the ADA's definition. For example, the plaintiff in *Kirkingburg, supra,* suffered from an uncorrectable condition in his left eye that effectively left him with monocular vision. *Kirkingburg, supra,* at 559, 119 S.Ct. 2162. Despite his vision impairment, the plaintiff demonstrated his ability to work as a commercial truck driver, a job which he held for more than one year before his employer realized that his eyesight rendered him unable to meet a federal regulation requiring a certain visual acuity and binocular vision for all commercial truck drivers. *Id.* at 559–60, 119 S.Ct. 2162. In analyzing whether the plaintiff's monocular vision *per se* rendered the plaintiff disabled within the meaning of the ADA, the Supreme Court stated that (1) the manner in which the major life activity of seeing is performed must be "significantly restricted" rather than merely "different" from the manner in which most people see; (2) the court must take into consideration "mitigating measures"; and (3) the determination must be made on a case-by-case basis. *Id.* at 563–66, 119 S.Ct. 2162.[7] Because the plaintiff submitted no evidence identifying the extent of his monocular vision, in terms of his own experience of his loss of depth perception and visual field, the plaintiff failed to establish his monocular vision rendered him disabled within the meaning of the ADA. *Id.* at 567, 119 S.Ct. 2162.

This court has previously found a plaintiff, a civilian desk sergeant at the Niagara Falls Air Force Reserve Base, was not disabled under the ADA based on his monocular vision. *Sherman, supra,* at 200.[8] In *Sherman,* plaintiff testified at his deposition that despite the surgical excision of his right eye due to a cancerous melanoma, resulting in monocular vision, plaintiff remained physically able to work at his desk sergeant position, drove without any restrictions on his driver's license, could read and watch television, walk without difficulty, experienced no difficulties in caring for himself, maintained his military qualifications for using firearms, and competed in a local darts league. *Sherman, supra,* at 197. The few difficulties posed by his monocular vision to which plaintiff testified included general depth perception problems which, on one occasion, caused him to walk into a tree and cut open the side of his face, stress and strain in his left eye resulting from watching computer and television monitors at work, and a vague reference that his job was hazardous to his health and safety because of the amount of responsibility he had. *Id.* at 197–98.[9] In an affidavit submitted later in opposition to summary judgment, plaintiff claimed that the loss of vision in his right eye left him without peripheral vision on his right-hand side prevented him from safely performing certain daily activities such as cooking because of the constant risk that he would overturn a hot pan, that twice he sustained broken toes when he walked into walls and fell down stairs, that he caused two car accidents because of his lack of depth per-

---

7. The court observes that what Hoehn references as the Supreme Court's findings and conclusion in *Kirkingburg, supra,* are actually portions of the underlying decision by the Ninth Circuit Court of Appeals which the Supreme Court reversed. *See* Plaintiff's Memorandum at 4–5 (citing *Kirkingburg, supra,* at 563–564, 119 S.Ct. 2162).

8. Although plaintiff in *Sherman* sued under the Rehabilitation Act, rather than the ADA,

the analysis of whether a plaintiff is disabled is identical under both acts. *Stone v. City of Mount Vernon,* 118 F.3d 92, 96–97 (2d Cir. 1997).

9. The plaintiff in *Sherman* did not explain how his monocular vision contributed to the alleged threat to his health and safety on the job.

ception, that he was unable to shave without cutting himself and could not walk without bumping into things or stumbling. *Id.* at 198. The plaintiff also submitted a statement from his treating physician attesting to his monocular vision and characterizing his resulting loss of visual field and depth perception as "substantial." *Id.* at 198–99. A later statement from the same physician explained that plaintiff could "be easily blindsided from objects approaching from his right side," and that plaintiff needed to exercise "extreme care with fast moving machinery" and activities involving depth or height or requiring wide peripheral fields. *Id.* at 199. Despite these assertions, the court found the plaintiff's monocular vision did not substantially limit his ability to see and plaintiff thus was unable to make a *prima facie* claim under the ADA. *Id.* at 199–200.

In *Ditullio v. Village of Massena*, 81 F.Supp.2d 397 (N.D.N.Y.2000), the plaintiff was a police officer who suffered a serious eye injury which significantly decreased his vision in his right eye. Following his injury, plaintiff was reassigned from patrol duty to limited desk duty. *Ditullio, supra,* at 400. When plaintiff's request to be reassigned to patrol duty was denied, plaintiff commenced an action under the ADA alleging his vision limitations rendered him disabled because he experienced "minor problems" with depth perception and sensitivity to bright light, but that he had no peripheral vision problems, could drive a car and that his vision deficit had not completely prevented him form engaging in any of his daily life activities or performing the essential functions of his job. *Id.* at 402. The court held plaintiff failed to establish a *prima facie* case of disability under the ADA based on his vision impairment because his stated restrictions cause him little difficulty in performing normal daily activities and, thus, did not establish a substantial limitation in

his ability to see. *Id.* at 405–06. In particular, plaintiff remained capable of shooting his service pistol "scoring well above the required score of 85% proficiency, despite the injury to his eye." *Id.* at 405.

Similarly, in *Rivera v. Apple Industrial Corp.*, 148 F.Supp.2d 202 (E.D.N.Y.2001), the court held that plaintiff, a security guard who was blind in his left eye, could not establish a *prima facie* case under the ADA based on his restricted ability to see because he failed to offer any evidence that his loss of depth perceptior and visual field was substantial, nor did his claim any limitations on his ability to perform any tasks or to work any specific shifts with regard to his job. *Rivera, supra,* at 207, 213–14.

Comparing the record in the instant case with the above cases in which the limited or monocular vision of the respective plaintiffs was found not to substantially impact their ability to see, the court finds that Hoehn's monocular vision also does not substantially impact his ability to see. Accordingly, Hoehn is unable to establish a *prima facie* case of disability under the first prong of the ADA's definition based on the impact of his monocular vision on his ability to see.

■■ As to the impact of Hoehn's monocular vision on his ability to work, the Supreme Court has held that when the major life activity under consideration in an ADA action is that of "working," the statute's phrase "substantially limits" requires, at a minimum, that the plaintiff allege an inability to work in a broad class of jobs, rather than in a single, specific job. *Sutton, supra,* at 491, 119 S.Ct. 2139. In the instant case, Hoehn has not alleged that he is unable to work in any specific job, much less a broad class of any jobs. Moreover, Hoehn's deposition testimony included numerous references to his ability

to perform his the job duties of his former security guard position and Hoehn denied experiencing any difficulty at that job because of his visual deficit. Accordingly, Hoehn cannot be considered disabled on the basis that his monocular vision substantially limits his ability to work.

As Hoehn is unable to establish a *prima facie* case that he is disabled under the first prong of the ADA's definition, *i.e.*, that his monocular vision substantially limits a major life activity, the court turns its attention to whether he has established a *prima facie* case of disability under the third prong, *i.e.*, that ISSI regarded him as having such a disability.

### B. *"Regarded As" Substantially Limited in a Major Life Activity*

Hoehn maintains that even if his monocular vision does not qualify as "a physical ... impairment that substantially limits one or more of the major life activities" so as to be considered disabled under the first prong of the ADA's definition, he nevertheless meets the third prong, *i.e.*, being "regarded as having such an impairment." Plaintiff's Memorandum at 10–12. ISSI argues in opposition that Hoehn has failed to provide any evidence that ISSI viewed him as unable to work as a security guard because of his monocular vision, or that Hoehn's termination resulted from anything other than the fact that GSA, upon reviewing Hoehn's medical certification, directed ISSI to remove Hoehn from the security guard position solely because Hoehn did not meet the contract's vision acuity requirement. Defendant's Reply Memorandum at 6–9.

 The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled, as defined in the ADA, or that such perception caused the adverse employment action challenged under the ADA. *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 153 (2d Cir.1998). Rather, the plaintiff must demonstrate that the defendant "perceived his impairment as substantially limiting the exercise of a major life activity." *Id.* In the instant case, Hoehn has not presented any evidence suggesting that ISSI perceived him as substantially limited in his ability to see or to work.

 As to Hoehn's ability to see, the parties agree that Hoehn's monocular vision did not interfere with his ability to consistently fire his service revolver at the sharpshooter level which exceeded the security guard position requirement. The record also demonstrates that despite his vision impairment, Hoehn could safely operate a motor vehicle and had regularly done so since 1956 when he sustained his eye injury; he could also walk and tend to his daily needs without difficulty. Nor did Hoehn's vision deficit ever pose any problem with the job duties of his security guard position. On this record, drawing all reasonable inferences in Hoehn's favor, as required on summary judgment, there is not basis for concluding that ISSI regarded Hoehn as substantially limited in his ability to see.

 Nor is there any basis to conclude ISSI regarded Hoehn as substantially limited in his ability to work. As discussed, Discussion, *supra*, at 18–19, when the major life activity at issue in an ADA action is working, the statutory phrase "substantially limits" refers to a plaintiff's inability to work in a broad class of jobs, rather than in a single, specific job. Specifically, Hoehn presents no evidence which raises a material issue of whether ISSI regarded Hoehn as disabled or that ISSI simply regarded him as disqualified for the security guard position because he failed to meet

the binocular vision requirement. ISSI, however, submits in support of summary judgment a letter written by Hoehn's ISSI supervisor Donna M. Metz protesting Hoehn's termination and explaining that in the eight years that Hoehn never had any problems performing his job duties while working as a security guard at the Dulski building. Metz Letter, Defendant's Ex. 10. Metz's letter, which Hoehn has not challenged, negates Hoehn's argument that ISSI regarded him as unable to work as a security guard or a broad range of such jobs.

As Hoehn has presented no evidence which, construed in his favor, would support a finding that ISSI regarded him as substantially limited with regard to the security guard position, and certainly not to any class of jobs, Hoehn has thus failed to meet his burden in opposing summary judgment of establishing that ISSI regarded him as disabled based on the impact of his monocular vision on his ability to see or to work.

Furthermore, *Heyman, supra,* on which Hoehn relies in opposing summary judgment, Plaintiff's Memorandum at 11–12, is factually distinguishable. In particular, in *Heyman,* plaintiff who was diagnosed with lymphoma sued his former employer under the ADA arguing his employment was terminated because the employer believed that plaintiff's illness would significantly restrict his ability to perform his job, despite the fact that at the time of his termination, plaintiff had missed only a few hours of work to seek treatment. *Heyman, supra,* at 70–71. In support of his position that his employer regarded him as disabled, plaintiff submitted evidence demonstrating the employer's concern that plaintiff's illness would interfere with his job's required time commitment given that another employee who also had lymphoma missed significant amounts of time seeking

treatment and ultimately died from the illness. *Id.* at 73. The court held that a reasonable jury could find that the defendant employer's previous experience that the other employee with lymphoma missed significant amounts of time and was unable to complete his job duties led the employer to conclude that plaintiff, afflicted with the same disease, would also become unable to perform his job and, thus, a liability to the workplace. *Id.* at 73. In contrast, Hoehn has not presented any evidence demonstrating ISSI believed his monocular vision would interfere with Hoehn's ability to successfully perform the duties of the security guard position.

Because Hoehn has failed to demonstrate his monocular vision renders him disabled as defined under the ADA, he has failed to establish a *prima facie* case of employment discrimination under the ADA and summary judgment should be GRANTED in favor of ISSI. Nevertheless, as the matter is before the court for a Report and Recommendation, should the District Judge determine Hoehn has established such a *prima facie* case, the court, in the interest of completeness, considers in the alternative whether Hoehn ever requested a reasonable accommodation for his impairment and, if so, whether ISSI unreasonable refused such request.

**C. *Request for Reasonable Accommodation***

ISSI asserts that if Hoehn has established that he is disabled within the meaning of the ADA, then he has failed to demonstrate that he ever requested a reasonable accommodation, *i.e.,* waiver of the security guard's vision acuity requirement, from ISSI and, as such, ISSI cannot be held responsible for providing such accommodation. Defendant's Memorandum at 14–15. ISSI further maintains that even if Hoehn had made such a request, that ISSI

nevertheless was not authorized to grant such an accommodation and that if ISSI waived the vision acuity requirement without the proper authority, ISSI would have had to breach the contract because its only employment in New York state were at federal government sites subject to GSA's requirements, including the binocular vision requirement for security guards contained in ISSI's contract with GSA. *Id.* at 15–17. Breaching the contract would likely have resulted in its cancellation which would have cost ISSI $1.6 million in lost annual revenue. *Id.* at 16–17.[10] Hoehn does not dispute that he was an employee of ISSI, rather than of GSA, yet argues in opposition that his attempts to contact ISSI Contract Manager Clayton Willman to request a waiver of the vision acuity requirement were futile as Willman never returned his calls, Hoehn Deposition T. at 174, and, as such, he cannot be faulted for failing to request a reasonable accommodation. Plaintiff's Memorandum at 12–13. Hoehn further maintains that even if ISSI had no authority to waive the vision acuity requirement, ISSI nevertheless could have offered him the alternative position of contract manager, a job which Hoehn held from 1996 until 1998, the physical requirements of which are less stringent than those of a security guard.[11] *Id.* at 13.

An employee who cannot perform the essential functions of a job, either with or without a reasonable accommodation, is not otherwise qualified for the job within the meaning of the ADA because an employer is not required to eliminate essential functions of the job to accommodate the impaired employee. *See Borkowski v. Valley Central School District,* 63 F.3d 131, 140 (2d Cir.1995). Once an employer knows of an employee's disabilities, however, the employer has an *"affirmative obligation* to reasonably accommodate these known disabilities," subject to such limitations as costs, and unavailability of a reasonable accommodation. *Borkowski, supra,* at 143 (emphasis added). Among the reasonable accommodations an employee can request is a transfer into a vacant position which the employee can perform. *Jackan v. New York State Department of Labor,* 205 F.3d 562, 565–66 (2d Cir.), *cert. denied,* 531 U.S. 931, 121 S.Ct. 314, 148 L.Ed.2d 251 (2000). The burden of establishing the existence of such a vacancy, however, rests on the employee. *Id.* at 566.

As stated, Hoehn maintains in the instant case that when GSA directed ISSI to remove Hoehn from all federal government sites, ISSI did not have to discharge him from his employment but, rather, could have promoted him to the contract manager position, a position which Hoehn held from 1996 until 1998. Plaintiff's Memorandum at 13. Although it is not clear precisely when in 1996 Hoehn commenced working as the ISSI contract manager and, as such, whether such position was vacant when Hoehn was terminated from his security guard position on September 30, 1996, it is significant that ISSI does not dispute this assertion. Accordingly, thorough review of the record, drawing all reasonable inferences in favor of Hoehn as the non-moving party, demon-

---

**10.** There is no merit to ISSI's assertion, Defendant's Reply Memorandum at 9, n. 12, that Hoehn's ADA claim actually lies against GSA and that Hoehn has sued the wrong party. As GSA was not Hoehn's employer, Hoehn could not sue GSA under the ADA which provides protection against an employer's discriminatory actions.

**11.** Hoehn was removed from the contract manager position in 1998 after he was accused of and charged with sexually harassing a female ISSI employee. Plaintiff's Memorandum at 13.

strates the existence of a material issue of fact regarding whether ISSI could have reasonably accommodated Hoehn's disability by immediately transferring him to the contract manager position and precluding summary judgment.

### D. *Pretext*

ISSI further argues that should the District Judge conclude that Hoehn has established a *prima facie* case of disability under the ADA, then his claim must still be dismissed because Hoehn has failed to demonstrate that ISSI's decision to discharge him based on its contract obligations was a pretext for unlawful discrimination based on Hoehn's disability. Defendant's Memorandum at 17–19; Defendant's Reply Memorandum at 10. Although Hoehn has not responded to this argument, the court finds it is without merit.

Significantly, for the District Judge to find that Hoehn has established a *prima facie* case of employment discrimination in violation of the ADA would require finding that Hoehn both meets the ADA's definition of disabled and has demonstrated that ISSI could have accommodated his disability either by securing a waiver of the vision requirement or by transferring him to the then vacant contract manager position. The determination that ISSI could have simply transferred Hoehn into the contract manager position, rather than terminate his employment, would necessarily beg the question of whether ISSI's proffered explanation that it had no choice but to terminate Hoehn upon being directed by GSA to remove Hoehn from all federal government worksites was factual. Accordingly, should the District Judge reach this issue, a material issue of fact would preclude summary judgment in favor of ISSI.

### CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment (Docket No. 66) should be GRANTED based on Plaintiff's failure to establish that he is disabled within the meaning of the ADA and the Clerk of the Court should be directed to close the case. Alternatively, a genuine issue of material fact exists regarding whether Hoehn requested a reasonable accommodation for his disability and, if so, whether ISSI properly denied the request, precluding summary judgment.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

Sept. 5, 2002.